394 S.E.2d 735

**The COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR**

v.

**John L. BOETTNER, Jr.**

No. 19211.

Supreme Court of Appeals of West Virginia.

March 23, 1990.

Dissenting Opinion of Justice Brotherton April 17, 1990.

Jack M. Marden, Cynthia Santoro Gustke, The Committee on Legal Ethics of the West Virginia State Bar, Charleston, for The Committee on Legal Ethics.

James T. Cooper, Lovett, Vaughn & Cooper, Charleston, for John L. Boettner, Jr.

MILLER, Justice:

In this disciplinary proceeding, the Committee on Legal Ethics of the West Virginia State Bar (Committee) asks us to annul the license to practice law of John L. Boettner, Jr. Mr. Boettner pled guilty in the United States District Court for the Southern District of West Virginia to violating 26 U.S.C. § 7201, which makes it a felony willfully to evade the payment of federal taxes.[1] The Committee maintains that this is a violation of Rule 8.4 of the Rules of Professional Conduct for lawyers.[2]

The respondent attorney first asserts that the facts surrounding his violation of 26 U.S.C. § 7201 do not warrant an annulment. He also requests that we remand the case to the Committee to enable him to have an evidentiary hearing to develop mitigating facts. In lieu of having his license annulled, the respondent asks that consideration be given to allowing him to serve without remuneration in a legal services corporation.

The director of the West Virginia Legal Services Plan, Inc. (Legal Services), joins in this request and asserts that there is a substantial need for the respondent's services. Attached to the brief of Legal Services is a letter from the United States Probation Office for the Southern District of West Virginia. This letter indicates that the probation office will accept the respondent's work for Legal Services as approved community service work which is required by his federal sentence.

This disciplinary proceeding was conducted pursuant to Article VI, Section 25 of the Constitution, By-Laws, and Rules and Regulations of the West Virginia State Bar (Bar By-Laws), which states that "a certified copy of the order or judgment of conviction shall be conclusive evidence of guilt of the crime or crimes of which the attorney has been convicted."[3] Under this sec-

---

1. 26 U.S.C. § 7201 provides:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution."

2. Rule 8.4 of the Rules of Professional Conduct states, in pertinent part:

"It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

"(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

"(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

"(d) engage in conduct that is prejudicial to the administration of justice[.]"

3. The relevant text of Article VI, Section 25 of the Bar By-Laws reads:

"[A] certified copy of the order or judgment of conviction shall be conclusive evidence of guilt of the crime or crimes of which the attorney has been convicted. A plea or verdict of guilty or a conviction after a plea of nolo contendere shall be deemed to be a conviction within the meaning of this section. The committee on legal ethics, the president, or the board may procure and transmit a certified copy of the order or judgment of conviction to the supreme court of appeals. Upon the filing of such judgment order of conviction, the court shall issue an order addressed to the attorney to show cause why his license should not be suspended or annulled."

tion, the certified order is filed with this Court, thus bypassing the usual hearing before a panel required by Article VI, Section 14 of the Bar By-Laws.[4]

In addition to the certified order, we have the criminal information to which the guilty plea was made and the plea agreement. There is also a transcript of the guilty plea hearing before the federal judge and the attorney's trial testimony in an unrelated case.[5] From these documents, the following facts can be established.

The respondent was a member of the West Virginia Senate and was its majority leader during the time involved. He obtained, through the help of a lobbyist, a bank loan. During the year 1985, the lobbyist and another person made several interest payments on Mr. Boettner's loan directly to the bank. Under the Internal Revenue Code, such payments constitute constructive income,[6] which the respondent failed to report on his federal income tax return. These payments would have increased the respondent's taxable income of $25,046 by approximately $4,000. In turn, this would have increased his income tax liability from $8,456 to $10,033.

Upon his plea of guilty to the income tax evasion charge, the respondent was required to resign from the Senate. He was sentenced to four years of supervised probation and was required to perform 1,600 hours of community service work. He agreed to work with representatives of the Internal Revenue Service to determine his correct tax liability for calendar years 1985 to the present. The plea agreement also indicates that two other charges, which had been investigated by the United States Attorney, would not be pursued.[7]

While the Committee initially based its disciplinary proceeding on Rule 8.4, it also refers us to Article VI, Section 23 of the Bar By-Laws, which relates to the disbarment of an attorney "upon proof that he has been convicted—(a) of any crime involving moral turpitude[.]"[8] The Committee relies on several earlier cases where we held that the willful failure to pay income taxes under 26 U.S.C. § 7201 is a crime of moral turpitude. *E.g., In re Trent,* 154 W.Va. 333, 175 S.E.2d 461 (1970); *In re West,* 155 W.Va. 648, 186 S.E.2d 776 (1972); *In the Matter of Mann,* 151 W.Va. 644, 154 S.E.2d 860 (1967). The applicable law is summarized in Syllabus Point 2 of *In the Matter of Mann, supra:*

> "Section 23, Part E., Article VI of the By-Laws of the West Virginia State Bar imposes upon any court before which an attorney has been qualified a mandatory duty to annul the license of such attorney to practice law upon proof that he has been convicted of any crime involving moral turpitude."

While Syllabus Point 2 of *Mann* authorizes "any court before which an attorney has been qualified" to annul the license, this was based on an older version of Article VI, Sections 23 and 24 of the Bar By-Laws. The present Article VI, Section 25 of the Bar By-Laws explicitly requires that a certified copy of the order of conviction

---

4. It is at this hearing that evidence is developed surrounding the alleged ethics violation. The charged attorney is afforded an opportunity to present defenses and offer matters in mitigation.

5. This case, styled *United States v. Tonkovich,* Criminal No. 2:89–00104, was pending in the United States District Court for the Southern District of West Virginia. It involved crimes committed by Mr. Tonkovich when he was President of the West Virginia Senate.

6. *See* 26 U.S.C. §§ 61(a)(12) & 102.

7. These charges included a Hobbs Act violation under 18 U.S.C. § 1951, and a conspiracy offense under 18 U.S.C. § 371.

8. The relevant portion of Article VI, Section 23 of the Bar By-Laws provides:

> "The license of any attorney shall be annulled and such attorney shall be disbarred upon proof that he has been convicted—(a) of any crime involving moral turpitude or professional unfitness; or (b) of receiving money for his client as his attorney and failing to pay the same on demand, or within six months after receipt thereof, without good and suffi-

be filed with this Court.[9] As we have already pointed out, once this procedure is invoked, the customary evidentiary hearing under Article VI, Section 14 is bypassed.

Rule 8.4, under which the Committee has proceeded and which became effective on January 1, 1989, concentrates on "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Our prior professional code provided that "a lawyer shall not ... engage in illegal conduct involving moral turpitude." Model Code of Professional Responsibility, DR 1–102(A)(3). The American Bar Association, which developed and approved the present rules, has prepared a book, entitled *Annotated Model Rules of Professional Conduct*," which describes the difference between these rules:

> "The Model Rules also eliminate the troublesome 'moral turpitude' standard of DR 1–102(A)(3) of the Model Code. This standard has been broadly defined as 'an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rule of right and duty between man and man.' " *Annotated Model Rules of Professional Conduct*, Rule 8.4 comment at 353 (1984). (Citation omitted).[10]

In *Committee on Legal Ethics v. Six*, 181 W.Va. 52, 54, 380 S.E.2d 219, 221 (1989), we observed that " 'moral turpitude' is an elusive concept incapable of precise definition[.]" *See also Committee on Legal Ethics v. Scherr*, 149 W.Va. 721, 726, 143 S.E.2d 141, 145 (1965) (" '[M]oral turpitude' ... has never been clearly defined because of the nature of the term."). In *Six*, we found the crime of embezzlement was an offense involving moral turpitude.

We find merit in Rule 8.4's abandonment of the term "moral turpitude" and the rule's focus on the criminal act as it reflects on the attorney's fitness to practice law. Moreover, we believe that there is a certain rigidity to the approach taken in our tax evasion cases. By categorizing all tax evasion convictions as involving "moral turpitude," annulment of the license becomes automatic under Article VI, Section 23 of the Bar By–Laws.

■ We acknowledged in Syllabus Point 2 of *Committee on Legal Ethics v. Six, supra*, that proof of final conviction satisfies the Committee's burden of proof:

> "Where there has been a final criminal conviction, proof on the record of such conviction satisfies the Committee on Legal Ethics' burden of proving an ethical violation arising from such conviction."

From a procedural due process standpoint, we believe that the respondent should be able to make an evidentiary record to show mitigating factors bearing on the disciplinary sentence.

■ There is general agreement that a license to practice law is a valuable right, such that its withdrawal must be accompanied by appropriate due process procedures. *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *In re Thies*, 213 U.S.App.D.C. 256, 662 F.2d 771 (D.C.Cir.1980); *In re Jones*, 506 F.2d 527 (8th Cir.1974); *The Florida Bar v. Cruz*, 490 So.2d 48 (Fla.1986); *The Florida Bar v. Fussell*, 179 So.2d 852 (Fla.1965); *In re Jones*, 696 P.2d 1215 (Utah 1985). Several courts have determined that where annulment of an attorney's license is sought based on a felony conviction under a provision similar to Article VI, Section 23 of the Bar By–Laws, due process requires the right to request an evidentiary hearing. The purpose of such a hearing is not to attack the conviction collaterally, but to introduce mitigating factors which may bear on the disciplinary punishment to be imposed. *In re Thies, supra; In re Jones*, 506 F.2d at 529; *The Florida Bar v. Cruz*,

cient reason for such failure, as in the statute provided."

**9.** For the relevant text of Article VI, Section 25 of the Bar By–Laws, see note 3, *supra*.

**10.** At the time the Rules of Professional Conduct were presented to this Court for approval, there was no mention made of the potential conflict between Rule 8.4 and Article VI, Section 23 of the Bar By–Laws.

*supra; The Florida Bar v. Fussell, supra; In re Jones,* 696 P.2d at 1216. *Contra Mitchell v. Association of Bar of City of New York,* 40 N.Y.2d 153, 386 N.Y.S.2d 95, 351 N.E.2d 743 (1976).

This due process issue was not discussed in our earlier cases involving automatic disbarment under Article IV, Section 23 of the Bar By–Laws.[11] We recognized in *In re Brown,* 164 W.Va. 234, 262 S.E.2d 444 (1980), the necessity of a developed factual record in order to determine whether a disbarred attorney should be readmitted to the practice of law. Even though the Bar By–Laws did not provide for such a hearing, we held under our supervisory powers that the Committee should provide such a hearing.[12]

■ We believe that an evidentiary mitigation hearing should be permitted where the annulment of a license is sought under Article VI, Section 23 of the Bar By–Laws. The right to such an evidentiary hearing is not automatic. In order to obtain such a hearing, the attorney must make a request therefor, as the respondent did here, after the Committee files its petition with this Court under Article VI, Section 25 of the Bar By–Laws.[13]

The hearing should be expeditiously held before the Committee, as we ordered in *In re Brown.* The Committee, after hearing the evidence of the respondent, who carries the burden of proving mitigation, and such countervailing evidence as the counsel for the Bar may offer, will make a disciplinary recommendation. This Court will then review the recommendation in light of the record made.

■ To the extent that *In the Matter of Mann, supra,* and like cases fail to provide for a mitigation hearing, they are overruled. Finally, pending the outcome of the mitigation hearing, we retain the right to suspend temporarily the license of an attorney who has been convicted of a felony. In the case of *In re Berzito,* 156 W.Va. 201, 192 S.E.2d 227 (1972), we recognized that under Article VI, Section 24, a temporary suspension could be ordered after conviction of a felony during the pendency of the appeal.[14] We do not believe that such a temporary suspension pending a prompt mitigation hearing violates due process.[15] *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *North v. West Virginia Bd. of Regents,* 160 W.Va. 248, 233 S.E.2d 411 (1977). We decline to order a temporary suspension in this case.

In creating this additional procedure, we make no intimation as to the appropriateness of the present disciplinary recommendation. Nor do we wish to be thought to endorse any of the alternatives being offered by the respondent. We do believe that a further hearing with a developed record will be beneficial in determining the appropriate disciplinary punishment.

Accordingly, we remand this case to the Committee on Legal Ethics of the West

11. A similar problem exists under Article VI, Section 24 of the Bar By–Laws, which provides that "the license of any attorney shall be suspended for such time as the court may prescribe upon proof that he has been convicted of a felony not involving moral turpitude or professional unfitness." Under Article VI, Section 25, the request to suspend the license is filed directly with this Court, and the normal hearing procedures set out in Article VI, Section 14 are bypassed. For the relevant text of Article VI, Section 25, see note 3, *supra.*

12. Syllabus Point 2 of *In re Brown, supra,* states:

"In cases involving reinstatement proceedings, we require, under this Court's supervisory powers, that the Committee on Legal Ethics of The West Virginia State Bar shall hold an evidentiary hearing to enable a record to be made on the issues relating to the petitioner's qualifications to have his license reinstated."

13. For the relevant provisions of Article VI, Section 25 of the Bar By–Laws, see note 3, *supra.*

14. For the relevant text of Article VI, Section 24 of the Bar By–Laws, see note 11, *supra.*

15. It must be remembered that the underlying ethical violation has already been established either by a jury finding or by a guilty or nolo contendere plea. Thus, there is no due process claim as to this finding, but only on the more minimal claim of mitigation.

Virginia State Bar for a hearing in accordance with the principles enunciated in this opinion.

Remanded.

BROTHERTON, Justice, dissenting:

I vehemently dissent to the majority opinion remanding this case to the Committee on Legal Ethics of the West Virginia State Bar for a hearing to permit the respondent to make an evidentiary record and present any *mitigating* factors which would allow the Committee to make a finding different from their recommended decision to annul Boettner's license to practice law.

After reading the majority opinion, I wonder if the legal profession will ever climb in the eyes of the general public to a position other than that just ahead of a used car salesman. It seems that for every step forward, we take two steps back. In these days of increased awareness of ethics, both professional and personal, one would expect this Court to tighten the ethical standards applicable to members of the legal profession. Instead, the majority loosens the standards to allow erring attorneys to explain away their misdeeds. Who better than lawyers can master that hurdle? Should the standards for attorneys be any less than the standards established for Caesar's wife?

West Virginia Code § 30–2–6 (1986) provides that, upon presentation of proof that the attorney in question has been convicted of a *felony* or any other crime involving moral turpitude, a court *shall* annul said attorney's license to practice law. In *In the Matter of Mann*, 151 W.Va. 644, 154 S.E.2d 860 (1967), this Court ruled on facts very similar to this case and annulled Fletcher W. Mann's license to practice law. In so holding, the Court stated:

> The present case must be distinguished from other cases of a similar nature in which courts of other jurisdictions are authorized to consider extenuating circumstances in determining proper disciplinary action against attorneys even in cases involving moral turpitude....
>
> *   *   *   *   *   *
>
> [W]e are of the opinion ... that the conviction of Fletcher W. Mann is one which involves moral turpitude [failure to pay income tax].

*Id.* 151 W.Va. at 648, 154 S.E.2d at 865, 866.

The rules that govern the practice of law in this area are presumed to be known by all licensed practitioners. Since the *Mann* decision in 1967 at least, these rules have been black and white and easily understood. However, the majority now turns the black and white to gray. By requiring the Legal Ethics Committee to hold a mitigation hearing, the majority opinion sends a message to the Committee that, even though they applied the law correctly, they may have been too harsh.[1]

In reaching their conclusion, the majority opinion explains that they had available to them a transcript of Boettner's guilty plea agreement hearing and his trial testimony in the federal case of *United States v. Tonkovich*, Criminal No. 2:89–00104. The Legal Ethics Committee also had these transcripts before them when they recommended that Boettner's license be annulled. After reviewing the transcripts, I cannot imagine what prompted the majority to reverse the well-reasoned principle set forth in *Mann* and require the Legal Ethics Committee to make a subjective decision as to whether there were extenuating circumstances at the time of the attorney's violation.

The transcripts reveal some interesting facts, some of which are well-known, while others were ignored by the majority. While elected to the Senate of West Virginia and serving as its Majority Leader, Boettner filed as a candidate for the office of Attorney General in the 1984 Democratic Primary. Boettner chose to seek this

---

1. Webster's New Collegiate Dictionary defines mitigate as "1. To render or become mild or milder; mollify. 2. To make or become less severe, harsh, etc.; meliorate; temper...." Black's Law Dictionary defines mitigation as "Alleviation; abatement or diminution of a penalty or punishment imposed by law. Reduction, diminishing, or lessening amount of penalty or punishment."

office in spite of the fact that, by his own admission, his financial situation for funding such a campaign was desperate. To assist him with this campaign, Boettner asked Sam D'Annunzio, a well-known legislative lobbyist who was also a director of the Lowndes Bank in Clarksburg, West Virginia, to help him obtain a $25,000 campaign loan from that bank. The lobbyist arranged for the loan, and Boettner executed a promissory note payable in ninety days. Boettner had no way to repay this debt unless he was victorious in the May, 1984, Primary. He lost his bid to be nominated for Attorney General, and after ninety days the bank began writing Boettner and threatening legal action if the note was not paid. It is clear from the transcript that Boettner's failure to pay the note and interest became a real problem for the bank, because bank regulators were questioning the note. Thus, in 1985 the lobbyist made a $2,700 interest payment on the note. Boettner did not claim this payment as a campaign contribution, nor did he report it as income on his federal tax return.

Further, a $500 check made payable to Boettner from Jack Catalano was apparently sent to the lobbyist, who in turn gave it to the bank, which then applied it to the monies due on the $25,000 loan. Boettner states that he did not know of this payment until a later date, and it was not reported as a campaign contribution nor shown as income on Boettner's 1985 income tax return. In August, 1985, the lobbyist made a second interest payment of $800 on the note, when Boettner again was unable to make any payment. Again, this $800 was not reported as a campaign contribution nor shown on Boettner's 1985 income tax return.

Still in desperate financial condition, Boettner sought re-election to the Senate of West Virginia in the spring of 1986 and found himself running against a candidate who had the ability to raise and spend money to defeat him. Thus, Boettner again asked his friends for help. Senator Anthony Yanero sent him $3,000, which Boettner did not report as a campaign contribution. The $3,000 contribution violated election laws, as do all single contributions in excess of $1,000. Therefore, Boettner treated it as a loan from himself to the campaign. Boettner repaid himself for this "loan" and then repaid Senator Yanero. The lobbyist, Sam D'Annunzio, also sent Boettner $3,000 through campaign workers and, again, none of this money was reported as a campaign contribution. Interestingly enough, Boettner was a member of the West Virginia Legislature when the campaign reporting laws were enacted.

To further complicate matters, in December, 1986, Boettner decided to acquire a house on Kanawha Boulevard in Charleston for the price of $80,000. Magnet Bank agreed to finance the purchase. However, Boettner realized that he could not make monthly payments on both the home mortgage loan and the note at Lowndes Bank. Thus, Boettner contacted his friend, State Senator Larry Tucker, a Vice President of Farmers & Merchants Bank in Summersville, to see if he could help him with the purchase of the house and transfer his campaign loan at Lowndes Bank to Senator Tucker's bank. Senator Tucker referred the matter to Sam D'Annunzio, who had a corporation which made real estate purchases. The lobbyist's corporation then purchased the house after arranging to have the appraisal increased to $100,000 or $110,000 and after financing was approved at Senator Tucker's bank. The mortgage loan was in the amount of $93,000 and apparently included the $13,000 remaining on Boettner's original $25,000 campaign loan from Lowndes Bank. As previously noted, the amount of Boettner's debt had been reduced by payments from his political fundraisers. The lobbyist purchased the house, paid the balance due on the note at the Lowndes Bank, and that amount was added to the mortgage payable at Senator Tucker's bank. Now, Boettner had no house debt or campaign debt.

Boettner moved into the house as a renter until the print media revealed the facts surrounding the purchase and assumption of the campaign loan. Boettner then moved out, claiming he did not realize the lobbyist had financed the house and loan.

Boettner signed a note at Senator Tucker's bank for the balance of the campaign note.[2]

Boettner learned of a federal investigation involving his campaign loan at Lowndes Bank when the lobbyist informed him that certain records involving the loan had been subpoenaed and that he should write the bank to obtain copies of all the records subpoenaed by the federal government. Boettner states that he subsequently learned that the lobbyist and Mr. Catalano had helped make payments on his campaign loan and that, at the request of the lobbyist, Senator Tucker had included the balance due on the campaign debt in the mortgage loan.

Subpoenaed in June, 1989, to appear before the federal grand jury investigating Senator Tucker, Boettner exercised his Fifth Amendment right not to testify and was taken before a federal judge and granted immunity so that he would testify. This immunity was granted before Boettner entered into a plea agreement. Boettner readily admitted that the reason for his willingness to enter into a plea bargain agreement with the federal government was the possibility that he was going to be charged with other criminal activity.

While testifying at Senator Tonkovich's trial, Boettner was questioned about his failure to report certain campaign contributions, and responded as follows:

Q. So is it fair to say in 1986 you made a deliberate decision to violate the criminal law?

A. I made a decision not to report it [the contributions from Mr. D'Annunzio, Mr. Catalano, and Senator Yanero].

Q. Which you knew would be a violation of a criminal law?

A. I knew that was required and I didn't do it, yes, sir.

Rule 8.4 of the Rules of Professional Conduct, upon which the Committee initially based its disciplinary proceeding, states as follows:

Rule 8.4 Misconduct

It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. . . .

In light of Boettner's own sworn testimony, which I quoted above, I am left to wonder what remains for the Ethics Committee to consider at a so-called mitigation hearing. What type of evidence could Boettner possibly produce at this point which would justify mitigating the punishment already recommended by the Legal Ethics Committee? I assume the majority wants the Committee to listen to the matters contained in the briefs which were filed after the Committee's decision and submission of the case to this Court for alternative types of punishment.

When Boettner learned of the majority opinion in this case, he was quoted by the electronic media as saying, "It is a great victory." I would have to agree. Mr. Boettner must feel like he is holding the winning ticket at the race track.

Boettner not only received immunity from further criminal prosecution for matters which had been under investigation by the federal prosecutor and the Kanawha County prosecutor in exchange for testimony, but also was given little more than a slap on the wrist in Federal District Court —probation, no fine, and public service. Then his ethics case reached this Court at a time when the majority obviously felt that standards for the practice of law should be less stringent than the standard set forth twenty-three years ago in *Mann*. The majority overruled *Mann* retroactively, despite the fact that Boettner, as an attorney, is presumed to know the law and should have been aware of the premise of *Mann* when he committed the crime.[3] Mr. Boettner, present your winning ticket at the window.

---

**2.** Whether the balance due on the campaign loan was ever paid is not revealed in the transcript.

**3.** In the end, Boettner even used the office granted to him by the voters as a bartering tool, agreeing to resign his Senate seat in order to get a lesser sentence. By the nature of their training and because of the oath they take when

In reading the *Mann* opinion, I note that Mr. Mann suffered from seriously impaired physical health at the time of his income tax violations. His ninety-one-year-old mother—an invalid, totally paralyzed, unconscious, and confined to a hospital—was dependent upon him for her support. Mr. Mann's wife had suffered a massive heart attack which required that she cease her employment as a school teacher and rendered her unable to perform household work. In fact, the Court noted that "[W]hile we are deeply sympathetic to Fletcher W. Mann because of his extremely heavy burden of troubles, we cannot agree that matters of this character are proper for consideration on the question of whether the offense of which he was convicted is one involving moral turpitude." *Mann*, 151 W.Va. at 649, 154 S.E.2d at 863. In spite of the Court's sympathy for Mr. Mann's plight, his license was annulled.

One can only hope that an heir of Fletcher W. Mann remains alive so that he might petition the State Bar's Committee on Legal Ethics on behalf of the late Mr. Mann for a mitigation hearing in the hope of having Mr. Mann's license reinstated posthumously.

accepting the duties of a practicing attorney, lawyers elected to public office should be held to a higher standard of conduct than other elected officials. As elected officials, this Court should be the guardian of the public trust. In this case that trust falls another degree because those who should enforce it have turned away from their responsibility.