415 S.E.2d 255

The COMMITTEE ON LEGAL ETHICS
OF THE WEST VIRGINIA STATE
BAR, Complainant,

v.

Thomas L. CRAIG, Jr., a Member
of the West Virginia State
Bar, Respondent.

No. 20612.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 14, 1992.

Decided Feb. 7, 1992.

Sherri D. Goodman, West Virginia State Bar, Charleston, for complainant.

Stephen B. Farmer, Jackson & Kelly, Charleston, for respondent.

MILLER, Justice:

In this disciplinary proceeding, the Committee on Legal Ethics of the West Virginia State Bar (Committee) asks us to suspend for a period of two years the license of the respondent, Thomas L. Craig, Jr., to practice law. For the reasons stated below, we reject the recommendation of the Committee and order a three-year suspension.

The respondent was admitted to the Bar in 1981. Prior to that time, he was closely associated with former Governor Arch A. Moore, Jr. The respondent served as a field coordinator in Moore's 1972 gubernatorial campaign and subsequently worked as a special assistant and administrative assistant to Governor Moore from 1972 to 1977. The respondent later turned down an appointment to serve as campaign manager in Moore's 1980 campaign.

The respondent subsequently accepted an offer to be Moore's campaign manager in the 1984 gubernatorial election. The respondent requested a $60,000 salary, but settled for less upon Moore's promise to make up the difference after the election.

The respondent worked on the campaign with Richard Barber, an advisor to Moore.[1] In the course of the campaign, Barber asked the respondent to tell Moore that he, Barber, needed "cash for the precincts." After the respondent conveyed the message, he met with Moore in a Charleston hotel room. Moore counted out $100,000 in one-hundred-dollar bills and gave it to the respondent. The respondent distributed the money to Barber and to other campaign workers.

Moore won the election. Afterwards, the respondent pressed Moore for the differential between his promised and his actual salary as campaign manager. At a subsequent meeting in Moore's law office, Moore gave the respondent $5,000 in cash as partial payment. When the respondent announced his intention to declare this money as income on his tax return, Moore told him "You can't report it." The respondent subsequently treated the cash payment as a gift.[2] After Moore took office as governor, the respondent worked for the administration, first as Chief Transition Officer and later as the Governor's Executive Assistant. The respondent returned to private practice in July of 1985.

In 1989, the United States Attorney for the Southern District of West Virginia was investigating Moore's possible involvement in unlawfully influencing changes in Workers' Compensation regulations while he was governor. The respondent was asked to testify before the federal grand jury in this regard. The respondent agreed and voluntarily testified before the grand jury on December 11, 1989. In the course of his appearance before the grand jury, however, the questioning turned to the 1984 gubernatorial campaign. A grand juror asked the respondent several questions concerning the use of cash in the campaign. Instead of consulting with his attorney, who was waiting outside, the respondent denied that cash payments had been made during the campaign. The Assistant United States Attorney, Joseph F. Savage, then asked the respondent whether, as in past campaigns, money had made its way from the governor to the precincts. The respondent again answered in the negative, stating that no cash had been injected into the 1984 campaign that he was aware of.

On December 28, 1989, Moore asked the respondent to meet with him at Moore's

---

1. In 1980, Mr. Barber was convicted of taking kickbacks in the form of cash political contributions and free liquor while serving as Governor Moore's Alcoholic Beverage Control Commissioner.

2. The respondent later declared this money as income and paid the taxes and penalties on it.

law office. Moore advised the respondent that he intended to reveal that he had turned the $100,000 in cash over to the respondent during the campaign because he, Moore, was facing a tax audit and investigation. The respondent advised Moore that he had already told the grand jury that no cash was involved in the 1984 campaign. Moore responded that this created a problem with respect to "our credibility" and suggested that the respondent return to the grand jury and assert that he had not understood the questions. When the respondent rejected this suggestion, Moore proposed that the respondent solicit those to whom he had distributed the cash or others to tell the United States Attorney that Moore himself gave them the money, thereby keeping the respondent "out of the loop." Moore suggested another meeting after the first of the year to work out a final solution.

Upon leaving Moore, the respondent contacted Barber and told him he intended to "make this thing right." The respondent then either phoned or visited his attorney, telling him that he wanted to report to the United States Attorney that he had lied to the grand jury. The respondent's attorney contacted Mr. Savage the following morning and obtained an immunity agreement. The respondent spoke to Mr. Savage that afternoon. There is no evidence that the United States Attorney's Office was suspicious of the respondent's grand jury testimony prior to this time.

On February 1, 1990, the respondent formally recanted his prior testimony and testified truthfully before the federal grand jury. Moore was subsequently indicted on a number of federal charges and pled guilty to five counts. On October 31, 1991, we annulled Moore's license to practice law. *See Committee on Legal Ethics v. Moore*, 186 W.Va. 127, 411 S.E.2d 452 (1991).

On February 9, 1991, the Committee charged that the respondent violated Disciplinary Rules 1–102(A)(3), (4), and (6) of the Code of Professional Responsibility by accepting the $100,000 in cash from Moore during the campaign and by failing to report the $5,000 cash bonus on his income tax return.[3] In addition, the Committee charged the respondent with violating Rules 8.4(b), (c), and (d) of the Rules of Professional Conduct by testifying falsely before the federal grand jury.[4] It appears that the respondent cooperated fully with the Committee in the investigation leading to these charges.

A hearing was conducted before the Committee on June 7, 1991. The respondent attributed his misconduct to his loyalty to his friend and mentor, Arch Moore. He testified that he knew that his solicitation and acceptance of the $100,000 cash from Moore for distribution to campaign workers constituted election law violations,[5] but asserted that he had no idea where the money came from or for what purposes it was used. The respondent testified that he treated the $5,000 cash bonus as a gift based on a legitimate interpretation of the federal tax laws. The respondent asserted that he gave false testimony to the grand jury because the direction of

---

3. These activities occurred prior to January 1, 1989, when the Code of Professional Responsibility was in effect. Disciplinary Rule 1–102 stated, in pertinent part:

   **DR 1–102 Misconduct.**—(A) A lawyer shall not:

   \* \* \* \* \* \*

   "(3) Engage in illegal conduct involving moral turpitude.
   "(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

   \* \* \* \* \* \*

   "(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

4. These activities took place after January 1, 1989, and are, therefore, governed by the Rules

of Professional Conduct. Rule 8.4 provides, in pertinent part:

   RULE 8.4 Misconduct
   "It is professional misconduct for a lawyer to:

   \* \* \* \* \* \*

   "(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
   "(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
   "(d) engage in conduct that is prejudicial to the administration of justice[.]"

5. *See* W.Va.Code, 3–8–5 (1980), 3–8–5d (1976), 3–8–12 (1978).

the questioning took him by surprise. He stated that he was distressed at having lied to the grand jury, but did nothing for several weeks because he felt the truth was not relevant to the Government's investigation. The respondent testified that it was not until his meeting with Moore on December 28, 1989, that he became aware of the probability that there had been substantial misconduct during the 1984 campaign and of the extent to which Moore was willing to subvert the judicial process to protect himself. The respondent expressed remorse for his actions and presented over 115 testimonials to his good character and standing in the community.

In its report, the Committee concluded that while the respondent may not technically have committed a crime in the course of his grand jury testimony,[6] he did lie under oath, conduct the Committee found to be deceitful, dishonest, and prejudicial to the administration of justice in violation of Rules 8.4(c) and (d) of the Rules of Professional Conduct. After considering the respondent's later recantation, his voluntary cooperation with federal authorities and the State Bar, and the "impressive and overwhelming array of witnesses attesting to [his] character," the Committee concluded that the respondent's misconduct warranted a two-year suspension of his license to practice law. Although the Committee found "compelling" the evidence relating to the respondent's violation of the election laws and his characterization of the cash payment from Moore as a gift, the Committee made no findings or conclusions with regard to the other charges. The Committee concluded that the respondent's false testimony alone was a sufficient justification for the recommended discipline.

In this proceeding, the respondent admits that he lied to the grand jury and does not challenge the Committee's conclusion that such activity violated the Rules of Professional Conduct. His only challenge is to the sanction to be imposed. The respondent argues that the facts presented demonstrated that further punishment is unnecessary to correct his behavior and that he is still fit to practice law. Basically, the respondent would have us impose no discipline at all. This we decline to do.

We have recognized that recommendations of the Committee are ordinarily to be given substantial consideration. *See Committee on Legal Ethics v. Smith*, 184 W.Va. 6, 399 S.E.2d 36 (1990); *Committee on Legal Ethics v. Harman*, 179 W.Va. 298, 367 S.E.2d 767 (1988); *Committee on Legal Ethics v. White*, 176 W.Va. 753, 349 S.E.2d 919 (1986); *In re L.E.C.*, 171 W.Va. 670, 301 S.E.2d 627 (1983). However, such recommendations are advisory only. *Committee on Legal Ethics v. Tatterson*, 177 W.Va. 356, 352 S.E.2d 107 (1986). In Syllabus Point 3 of *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 783 (1985), we stated:

> "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law."

*Accord* Syllabus Point 6, *Committee on Legal Ethics v. Farber*, 185 W.Va. 522, 408 S.E.2d 274 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992); Syllabus Point 1, *Committee on Legal Ethics v. Charonis*, 184 W.Va. 268, 400 S.E.2d 276 (1990); Syllabus Point 2, *Committee on Legal Ethics v. Lilly*, 174 W.Va. 680, 328 S.E.2d 695 (1985). We also made this statement in Syllabus Point 5 of *Committee on Legal Ethics v. Roark*, 181 W.Va. 260, 382 S.E.2d 313 (1989):

> " 'In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of

---

**6.** 18 U.S.C. § 1623(d) (1976), precludes a prosecution for perjury if, "in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false[.]" The parties apparently agree that the respondent came within the protection of this provision.

the Bar and at the same time restore public confidence in the ethical standards of the legal profession.' Syllabus Point 3, *Committee on Legal Ethics v. Walker*, [178 W.Va. 150], 358 S.E.2d 234 (1987)."

We believe the Committee's recommended sanction of a two-year suspension is insufficient. While the most serious of the respondent's violations was his false testimony before the grand jury, there was also evidence of election law violations of which the respondent was aware. Such actions violate the ethics rules and warrant sanctions in their own right. In addition, the question of whether the respondent improperly failed to report to the IRS the $5,000 cash bonus from Moore has not been resolved to this Court's satisfaction. The fact that the Committee did not impose sanctions upon the other charges in the complaint does not preclude us from considering such activities. *See Committee on Legal Ethics v. Douglas*, 179 W.Va. 490, 370 S.E.2d 325 (1988).

We have not had occasion to address disciplinary charges based on false or perjured grand jury testimony by an attorney. Other states have found that perjured testimony before a grand jury by an attorney will be grounds for disciplinary charges even though no criminal indictment has resulted. As the court stated in *Olguin v. State Bar*, 28 Cal.3d 195, 200, 167 Cal.Rptr. 876, 879, 616 P.2d 858, 861 (1980): "[F]alse testimony on a material issue is a serious breach of basic standards as well as a breach of the attorney's oath of office and his duties as an attorney. Grounds for disciplinary action will lie even though no harm results from such wrongful acts." *See also People v. Susman*, 196 Colo. 458, 587 P.2d 782 (1978); *In re Hutchinson*, 534 A.2d 919 (D.C.App.1987); *Matter of Price*, 429 N.E.2d 961 (Ind.1982); *State ex rel. Nebraska State Bar Ass'n v. Cook*, 194 Neb. 364, 232 N.W.2d 120 (1975); *In re Foster*, 60 N.J. 134, 286 A.2d 508 (1972); *Office of Disciplinary Counsel v. Shorall*, 527 Pa. 413, 592 A.2d 1285 (1991). *See generally* 7 Am.Jur.2d *Attorneys at Law* § 43 (1980 & Supp.1991).

The respondent points to several cases where an attorney who gave false testimony was given a disciplinary punishment of a year or less. *In re Hutchinson, supra; Matter of Price, supra.* On the other hand, other courts have imposed punishments of three years or more for false swearing by an attorney. *State ex rel. Nebraska State Bar Ass'n v. Cook, supra* (three-year suspension); *In re Foster, supra* (disbarment ordered); *Office of Disciplinary Counsel v. Shorall, supra* (three-year suspension). We agree with this statement from *State ex rel. Nebraska State Bar Association v. Cook*, 194 Neb. at 387, 232 N.W.2d at 131–32:

"The fact that certain lawyers in other jurisdictions may have been lightly dealt with can be no consideration with this court. We are responsible for the discipline only of members of the bar of this jurisdiction and must adhere to disciplinary standards we believe appropriate."

As we have already pointed out, the respondent's dereliction lies not merely in his initial false statements to the grand jury with regard to any cash campaign contributions, but also in obtaining the $100,000 in cash from Moore and distributing this money in violation of the State election laws, a matter that he could not ignore as a knowledgeable campaign person. Much the same is true of the $5,000 cash payment he received from Moore which he initially characterized as a gift. These two matters were not dealt with by the Committee in arriving at its disciplinary recommendation. However, we find that they cannot be ignored.

Recently, in *Committee on Legal Ethics v. Hess*, 186 W.Va. 514, 413 S.E.2d 169 (1991) we addressed the appropriate sanction for an attorney who, through deceit, had converted the income of his law firm to his personal use. Even though the attorney ultimately repaid the funds, we concluded that his actions, constituting breach of his fiduciary duty to his law partners, warranted a four-year suspension from practice. Because the attorney had ceased practicing law two years before, we im-

posed an actual suspension of only two additional years.

We believe the respondent's misconduct is *at least* as serious as that which warranted a four-year suspension of the attorney in *Hess.* However, we feel that the mitigating circumstances present in this case justify some leniency. Accordingly, we order the respondent suspended from the practice of law for a period of three years. The suspension will commence upon April 15, 1992, to allow the respondent time to wind up his practice. At the conclusion of the three-year period, the respondent may petition for reinstatement to the Bar in accordance with the provisions of Article VI, Sections 31 and 32 of the By-Laws of the West Virginia State Bar. The costs of the Committee will be paid by the respondent.

Three-year suspension and costs.

NEELY, J., dissents.

BROTHERTON, J., dissents and reserves the right to file a dissenting opinion.

NEELY, Justice, dissenting:

I would accept the recommendation of the Committee on Legal Ethics of the West Virginia State Bar and impose only a two-year suspension.

BROTHERTON, Justice, dissenting:

I dissent to the majority opinion for two reasons.

First, I believe that the evidence presented at the West Virginia State Bar Committee on Legal Ethics hearing makes the three-year suspension inappropriate for the ethical violations charged and proven. Based upon that evidence, the penalty should have been annulment of the respondent's license to practice law.

Secondly, I am disturbed by this opinion's creation of a new method of proving ethical violations and for obtaining leniency or forgiveness in the resulting penalty.

For years I have heard it said that those who can afford "high-priced" lawyers and have connections with people in positions of authority stand a better chance of receiving a lesser sentence for wrongdoing than people who lack contacts and must depend on legal assistance from the public defender or a lawyer/friend who is not experienced in the type of case being undertaken. This is not to suggest that the respondent's connections are what saved him from a greater punishment in this case, although one must admit that the Ethics Committee record, report, and recommendations create an aura of suspicion.[1]

That suspicion bursts into life upon reading the Committee on Legal Ethics' Findings of Fact, Conclusions of Law and Recommended Decision:

The Committee has never been presented with such an *impressive and overwhelming* array of witnesses attesting to an individual's character. Witnesses from such diverse perspectives as the president of a major university, the associate editor of a major metropolitan newspaper and the former chair person of a Committee on Legal Ethics of the West Virginia State Bar, all offered with *passion and conviction,* their views that the respondent was a unique individual deserving of compassion from the Committee for any misdeeds that he may have committed.

It is against this backdrop that the Committee is being asked to determine if the respondent has violated any ethical standards and if so, what the recommended discipline should be.

(Emphasis added.)

Further fanning the flames is the Committee's finding that the respondent did not violate Disciplinary Rules 1–102(A)(3) and (4),[2] despite the respondent's own testimo-

---

1. In the more than seven years that I have been a member of this Court, I have never had an occasion to believe that any past or present member of this Court gave any consideration to the attorneys, parties, or witnesses, in arriving at their decision. The decisions are reached solely on the basis of the legal issues presented.

2. The alleged violation resulted from a charge that during the 1984 general election campaign the respondent accepted $100,000 cash from gu-

ny admitting that the charges were true. There was no evidence introduced to the contrary. The Committee found the evidence as to the election law violation—acceptance and use of the $100,000 cash and failure to report the $5,000 bonus as income—"compelling," but made no finding that this conduct constituted an ethical violation. How much more compelling would the evidence have to be to find a violation of DR1–102? Surely the average lay person reviewing this evidence would recognize the testimony as both compelling and a violation of the rule. Yet the Committee on Legal Ethics, despite admitting the testimony was "compelling," found no violation of DR1–102. As if to excuse their omission, the Committee gushed that they had never been presented "with such an impressive and overwhelming array of witnesses attesting to an individual's character." [3]

If the respondent's own testimony does not prove a violation of DR1–102 in this case, then perhaps that disciplinary rule is best characterized as a fiction, to be applied only when the Committee wishes to discipline an offending lawyer and can find no other disciplinary rule under which to do so. In this case, the proof of a violation of DR1–102 is clear and convincing, and, in my opinion, beyond all reasonable doubt.

The Committee then determined that the State Bar offered *clear, convincing and preponderant* proof that the respondent violated Rule 8.4 of the Rules of Professional Conduct by testifying falsely before the federal grand jury. It is difficult for me to see how the State Bar's proof could be clear, convincing and preponderant on the charge of falsely testifying before the federal grand jury and, although compelling, lack clarity on the issues of election law and income tax violations. Such a finding leaves a distinct impression that the

Committee was biased and intent upon finding a lesser violation.

The Committee's recommendation in this case becomes even stranger when one examines the recommendation in both of the *In re Boettner* hearings. Boettner plead guilty to a felony charge of federal income tax evasion, and the facts were far less egregious than those admitted to by Craig. On two separate occasions, following the original charge of unethical conduct and after the mitigation hearing, the Committee recommended annulment of John Boettner's license to practice law. When the two are compared, the two-year suspension recommended for Craig is inconsistent and difficult to explain.

Oddly enough, it was this Court's opinion in *Boettner* that created the inconsistency. In *Boettner,* the Court overruled *In re Mann,* 151 W.Va. 644, 154 S.E.2d 860 (1967), and, for the first time, gave lawyers a right to a mitigation hearing on ethics charges. The majority opinion in *Craig* now expands the parameters of a mitigation hearing and illustrates my most serious objection to the Committee's finding and the majority's opinion: the adoption of a standard for evaluating punishment based upon the "character of the violator."

*Bouvier's Law Dictionary,* (1946 ed.), defines mitigation as "[c]ircumstances which do not amount to a justification or excuse of the act committed yet may be properly considered in mitigation of the punishment: as, for example, the fact that one who stole a loaf of bread was starving." The definition of mitigation and the mitigation evidence presented in the majority opinion in this case are totally dissimilar. No recognizable mitigating circumstances can be identified in *Craig.*

Craig's unethical conduct began in 1984 and included the acceptance of $100,000 in cash for use in the general election, the

---

bernatorial candidate Arch Moore. This cash was to be distributed to others to facilitate the election of Arch Moore. The respondent was also charged with failing to report a $5,000 cash bonus from Moore on his income tax return.

**3.** To the credit of the majority, they saw through the attempt to reduce the magnitude of the

ethical violation and found that there was a violation of the ethics rule which warranted sanctions in its own right. The majority further found that the matter of the $5,000 cash bonus or payment had not been resolved to this Court's satisfaction.

actual distribution of that cash to others in the general election,[4] and the failure to report a 1984 $5,000 "gift" as additional payment for work in the campaign.[5] The unethical behavior culminated five years later when the respondent was given an opportunity to confess his 1984 actions when called before a federal grand jury and asked about the use of cash by Arch Moore in the 1984 election. With his lawyer sitting outside the grand jury room, the respondent denied that he had seen or used money in the 1984 election.

Without question, the respondent lied to the grand jury and obviously felt no remorse for having violated the law in 1984. It was not until some weeks later, when Governor Moore told him that he, too, was under investigation, and he was going to have to make an explanation to the same federal grand jury, that the respondent realized that lying to the grand jury was a mistake. Yet even after he realized that his lie would be discovered when Governor Moore appeared before the grand jury and implicated him, the respondent did not go directly to the federal prosecutor and confess his perjury. Instead, he first informed a confederate who participated in the distribution of the cash, and then consulted with his attorney. His attorney went to the federal prosecutor and told him his client had information that might help them get Moore, but if he testified he would criminally incriminate himself. Needing the respondent's testimony, the prosecutor granted him immunity from prosecution if he gave truthful testimony before the grand jury. The respondent agreed to be named as an unindicted co-conspirator or an unindicted aider and abettor.

The reason for the respondent's sudden attack of conscience is obvious from his testimony before the Committee:

By Ms. Rose:

Q. Mr. Craig, I just have one or maybe two [more questions].

The meeting with Moore was the event that triggered your recantation; is that correct?

A. It was the catalyst for it.

T.L. Craig, Jr.—Cross-examination at page 330.

Except for the fact that the respondent was not indicted, how does this case differ in principle from the ethics cases against Arch Moore, John Leaberry, Greg Gorrell, and others, who, had they known of the Committee's adoption of a new character test, could have offered similar testimony? But for the immunity Craig received, he would have been indicted. Where in this sordid scenario can the majority find "mitigation" as defined by the dictionary? What circumstances amount to a justification of his acts or what excuses spell out mitigating circumstances? The answer is simple: there are none.

With the *Boettner* and *Craig* opinions, this Court shifts, without warning, from an objective standard of judging ethical conduct to a subjective standard that allows each justice to establish a standard of punishment in his own mind rather than judging solely on the facts. Mitigation is now defined as an issue of character. Instead of limiting the mitigation evidence to the circumstances that caused the lawyer to commit the ethics violation, this opinion permits the introduction of an unlimited number of letters reciting the fine qualities of the violator, testimony of outstanding public works, service on community agencies and boards, a veritable "This Is Your Life" TV program. Somewhere, we have lost the focus of the reason for professional ethics: to protect the public, not the welfare of the violator.

The type of mitigation evidence presented in this case is irrelevant and puts the cart before the horse. Isn't every lawyer required to be of good character, a performer of pro bono work, a contributor to the betterment of the community in which he lives? If this is true, and I always

---

4. The distribution of that cash resulted in the subsequent conviction of some of those to whom the money was distributed.

5. The respondent admitted in testimony before the Committee that this payment was actually income and not a gift.

thought it was, how does the evidence in *Craig* or *Boettner* allow for a punishment different from that prescribed in *In re Mann?*

Although the majority opinion recognized that Craig's violations warranted a four-year suspension rather than the two years proposed by the Committee, it then fell prey to the new mitigation standards born in the *Boettner* opinion, nurtured by the Legal Ethics Committee character test, and legitimized in this opinion, and reduced Craig's suspension to three years.

In an interview with the Washington & Lee Law News, Vol. 20, No. 7, February 13, 1992, Professor Franklin M. Schultz[6] explained how he felt the practice of law had changed:

I asked him if he thought that students had changed since he began teaching in 1947. "Really, the practice of law has changed," he replied. "The emphasis today is so much more on the business side of practice ... making a good living, that I think it's reflected in the attitude of the students that come to law school.

"When I started, there was more of a notion that if you want more material things in life, go into business. Making money should not be the reason for going into law.... Back then, law was first a profession, and second a business."

Professor Schultz' comments echo my dismay with this case and this Court's general trend in ethics cases. With opinions like *Craig* and *Boettner*, this Court reduces the ethical standards of our profession to a level that is embarrassingly low and encourages the image of the law, not as a profession, but as a business with limited accountability to the public we are meant to serve.

---

6. B.A. 1939; L.L.B. 1942; Yale University, Visiting Professor of Law, Washington & Lee University of Law, 1991–92; Associate Professor, Indiana University School of Law; Visiting Professor, University of Iowa School of Law; D.C.

Bar General Counsel and Member of Ethics Committee; Chairman, Administrative Law Section of the American Bar Association; American Law Institute; ABA Joint Committee on Continuing Legal Education.