416 S.E.2d 480

**In the Matter of Tod J. KAUFMAN, Judge, Circuit Court of Kanawha County.**

**No. 20107.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 1992.

Decided April 2, 1992.

Charles R. Garten, Charleston, for Judicial Investigation Comm'n of West Virginia.

Sterl F. Shinaberry, Shinaberry, Meade & Venezia, Charleston, for Judge Kaufman.

BROTHERTON, Justice:

In this disciplinary proceeding, the respondent, the Honorable Tod J. Kaufman, Judge of the Circuit Court of Kanawha County, was directed to appear before this Court on January 14, 1992, and show cause why an order should not be entered imposing the sanctions against him which were proposed by the West Virginia Judicial Hearing Board on October 22, 1991. "The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial (Hearing) Board in disciplinary proceedings." Syl. pt. 1, *West Virginia Judicial Inquiry Commission v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980).

We begin with a brief review of the facts in this case. Charleston Area Medical Center, Inc., (CAMC) filed a complaint against the respondent on January 16, 1991, alleging several violations of the Judicial Code of Ethics in connection with a phone call the respondent made to the President of CAMC, Philip H. Goodwin, on December 18, 1990. The telephone call pertained to a case which was pending before Judge Kaufman, *Dairyland Insurance Company v. Mary A. Barker, et al.*, Civil Action No. 90–C–3016.

The plaintiff in that case was an infant who was injured in an accident involving a vehicle that was insured by Dairyland Insurance Company to a liability coverage limit of $20,000. Dairyland filed an interpleader action in the Circuit Court of Kanawha County, requesting that it be permitted to deposit monies with the court and be relieved of future obligations. However, at a hearing on October 29, 1990, CAMC objected when a motion to award the plaintiff the entire $20,000 was made by an assistant prosecuting attorney and the plaintiff's guardian. The court then agreed to give CAMC and other interested medical providers time in which to file additional memoranda and address the issue of why the plaintiff should not receive all of the insurance proceeds, to the exclusion of the interests of the medical care providers. CAMC filed its written objections on November 13, 1990. The next hearing was set for January 8, 1991.

In the interim, however, because the plaintiff was without money during the holidays, her guardian ad litem requested an emergency hearing, which was set for 7:30 a.m. on December 18, 1990. Notice was given to all parties, but CAMC counsel did not appear. The hearing lasted for approximately forty-five minutes, during which time it was agreed that $500 of the interpleaded funds would be disbursed to the plaintiff within two days and that she would receive an additional $500 within two weeks.

Shortly after the hearing concluded, CAMC counsel Jonathan Nicol arrived and apologized to the court for having overslept that morning. Judge Kaufman told Nicol to be present at the next hearing, which had already been scheduled for January 8, 1991, and to bring his client, Philip H. Goodwin, the President of CAMC. Judge Kaufman states that he told Nicol to make sure that Goodwin had his calendar free and would be available to appear at the hearing. He also states that he indicated that he would call Goodwin himself and follow up the conversation with a letter of confirmation to all parties, including Goodwin. Nicol denies that Judge Kaufman stated his intention to call Goodwin. However, there is testimony of a deputy clerk and a bailiff which confirms the respondent's statements.

Judge Kaufman telephoned Mr. Goodwin on December 18, 1990. He states that he made this call in order to ensure that Goodwin would appear at the next hearing because CAMC's attorney, Nicol, had no experience in handling that particular type of proceeding. According to Judge Kaufman, he explained the background of the case, the nature of the issues involved, and its current posture. This was done in response to Goodwin's statement that he didn't know anything about the case. However, Judge Kaufman states that he did not address any of the substantive issues involved in the case.

On December 19, 1990, Goodwin directed a memo to Marshall A. McMullen, Jr., General Counsel for CAMC, in which he reported Judge Kaufman's phone call and asked for his "review and analysis of the circumstances involved...."[1] The Judicial Investigation Commission contends that this memo represents the "best evidence" of the overall impression created by the phone call. In the memo, Goodwin stated, "I had a pleasant conversation with Judge Kaufman, however, the message was pretty clear that he wanted CAMC to alter its course regarding attempting to collect on a bill for services rendered to a young lady injured in an automobile accident." At another point in the memo, Goodwin said:

On a number of occasions during the conversation, he indicated he intended to call me to appear in this hearing (for what purpose I am not sure) if some other arrangement or course of action could not be worked out. It was obvious he did not want to have the hearing and that he felt CAMC was taking inappropriate action in attempts to receive some of the proceeds from this settlement. He indicated, of course, that any of the parties had a right to due process, but

made some reference that if this was a place that CAMC intended to test the validity of a ruling from his court and the Supreme Court, "this was not the case or issue to do it on."

Goodwin subsequently testified that "[m]y interpretation of the call was that it was clear that the judge was unhappy with our action in this case, and it was intended to cause me to review the case, and withdraw our action in the case as it related to the attempts to collect the bill."

The day after his call to Goodwin, on December 19, 1990, Judge Kaufman sent a letter to all the parties to the case, addressed "To Whom It May Concern," advising as follows:

As the record of the hearing at 7:30 a.m. on December 18, 1990 will reflect, Charleston Area Medical Center, Inc., by counsel, was duly noticed and did not appear. Primarily because of CAMC's objections, the Court had its second hearing in the guardian-ad-litem proceeding. Now, a third hearing on the same matter has been set down on January 8, 1991 at 1:30 p.m.

Counsel for CAMC is hereby directed that CAMC President Philip Goodwin be present at this hearing and shall attend. The purpose of this hearing, among other things, is to further make a record for reconsideration in this case.

Finally, CAMC has filed literally tens of default judgment actions in this Court this term, suing scores of patients throughout the County for monies allegedly owed and this Court has bent over backwards to be accessible to CAMC as it has to *all* litigants this term. However, CAMC is not entitled and will not be given preferential treatment in this case and should be on notice that if they miss another hearing on January 8, 1991,

---

1. In testimony before the Judicial Hearing Board on August 28, 1991, Goodwin was asked whether he took any action in response to the telephone call: "Yes, I contacted our hospital general counsel, and I had indicated to the judge before I hung up that we did not routinely make it a point to go overboard in collecting accounts, that we wrote off a lot of accounts. We also have a very heavy charity level and so forth, and that I would look into this matter and

if we were acting inappropriately, we would consider what our actions were." Goodwin then added, "I asked our general counsel to look into this. I reported to him on the call I'd received and that the judge was concerned about our level of attempts to collect this case and asked, if they would, to review the case and give me a report so I could respond to the judge in an appropriate fashion."

then they may well be dismissed from this present suit.

CAMC perceived Judge Kaufman's conduct in the *Dairyland* case to be unethical, and filed a complaint with the Judicial Investigation Commission of West Virginia on January 16, 1991, requesting a full investigation of the matters contained in its complaint.

On March 28, 1991, the Judicial Investigation Commission found probable cause to file a complaint with the West Virginia Judicial Hearing Board, charging Judge Kaufman with violations of Canon 2 A and Canon 3 A(1) and (4) of the Judicial Code of Ethics.[2] The Board heard the case on August 28, 1991, and filed its recommended findings of fact, conclusions of law and proposed disposition on October 22, 1991.

The Board found violations of Canons 3 A(1) and 3 A(4) by votes of 6–2 and 8–0 respectively. However, by a 4–4 vote, no violation was recommended for Canon 2 A. By an 8–0 vote, the Board recommended that Judge Kaufman be admonished but that he pay no costs for the proceedings.

The Judicial Investigation Commission now argues that this Court should not accept the Judicial Hearing Board's recommendation with respect to Canon 2, and that sanctions should be imposed against Judge Kaufman. Relative to Canon 3, the Commission asks that the Board's recommendations be accepted. The Commission argues that the evidence and testimony presented at the hearing offer clear and convincing evidence that violations of the Canons have occurred. Although we agree that Judge Kaufman's telephone call to a party to litigation pending in his court who was represented by counsel violated Canon 3 A(1) and (4) of the Judicial Code of Ethics, we find no violation of Canon 2.

In concluding that a violation of Canon 3 did occur, it is unnecessary for us to dissect the conflicting evidence which the parties offered at the hearing below, or to delve into the alleged motivations of the parties to these proceedings. Although factual

disputes remain, our decision is based solely upon the undisputed fact that the phone call was made.

The initiation of *ex parte* communications by a judge is strictly prohibited by Canon 3 A(4) of the Judicial Code of Ethics, "except as authorized by law." Canon 3 A(1) and (4) provides as follows:

A judge should perform the duties of his office impartially and diligently.

The judicial duties of a judge take precedence over all of his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

A. *Adjudicative Responsibilities.*

(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism....

\* \* \* \* \* \*

(4) *A judge should* accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, *except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.* A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond. (Emphasis added.)

It should be obvious from the specific proscription against *ex parte* communications in Canon 3 A(4) that a judge should not initiate a telephone conversation with a party to a pending or impending proceeding who is represented by counsel.[3]

In order to promote public confidence in the judiciary, courts have imposed sanctions varying from reprimand to removal, against judges held to have engaged in *ex*

---

**2.** Canon 2 states generally that a judge should avoid impropriety and the appearance of impropriety in all his activities. Canon 3 states that a judge should perform the duties of his office impartially and diligently.

**3.** Similarly, the Rules of Professional Conduct constrain attorneys from communicating with parties whom they know to be represented by

*parte* communications.[4] In *In re Sturgis*, 529 So.2d 281 (Fla.1988), the Supreme Court of Florida imposed sanctions stronger than those recommended in this case on a circuit judge who engaged in *ex parte* communications with a party. The judge admitted calling one parent about visitation "in a moment of weakness." Because the record reflected the judge's concern for the welfare of children in custody matters, and in light of his illustrious public service during a fifteen-year tenure on the bench, the court found that removal from office was not warranted. However, a public reprimand in the form of publication of the disciplinary commission's report and an oral and public reprimand before the court at the judge's expense was imposed by the court.

In *Matter of Judicial Disciplinary Proceedings Against Aulik*, 146 Wis.2d 57, 429 N.W.2d 759 (1988), the Supreme Court of Wisconsin suspended a judge from office for ninety days without compensation for communicating *ex parte* with counsel on the merits of a contested matter which was pending before him, and for failing to fully inform counsel for the other party that the *ex parte* communications had been discovered. Wisconsin's Judicial Conduct Panel considered both the judge's motivation for the *ex parte* communications and his conduct subsequent to their discovery to be immaterial to the issue of whether he engaged in judicial misconduct. "[E]ven accepting Judge Aulik's claims that he did not intend to give one party an advantage in the pending case and that the *ex parte* communications did not affect its outcome, the panel concluded that his conduct 'appeared to compromise the integrity of the decision-making process ...'" and also

served to give one law firm an advantage over its opposing counsel. *Id.*, 429 N.W.2d at 766. The panel stated:

Apart from Judge Aulik's intent or motive, his actions struck directly at the decision-making process and the public confidence in that process. In terms of behavior relating to a judge's official capacity, no rule is perhaps more fundamental or necessary than that forbidding *ex parte* communications concerning substantive issues pending before a court. In addition, the effect of Judge Aulik's actions throughout the ... case was one which resulted in the uneven treatment of one party over the other.

*Id.*

The Supreme Court of Wisconsin agreed and concluded that "Judge Aulik compromised the integrity of the court system, acted with partiality in a matter pending before him and violated the elemental rule of fair play by engaging in, indeed, by initiating private conversations with counsel representing one side concerning the merits of a contested issue." *Id.* The court found it immaterial that there was no evidence that either the attorney who was privy to the *ex parte* communications or his law firm used the information to its advantage in attempting to settle the case. "[T]he gravity of Judge Aulik's conduct lies in the potential for harm it occasioned and in the harm it actually caused to the court system ... Those *ex parte* communications subverted the very process Judge Aulik was sworn to administer." *Id.*

The same concern for the judicial process that the Wisconsin Supreme Court expressed in *Aulik* is relevant to our decision in this case. The respondent contends that his telephone call to Goodwin was a direct communication to CAMC, and was *ex parte*

---

4. counsel. In *Dent v. Kaufman*, 185 W.Va. 171, 406 S.E.2d 68 (1991), for example, this Court discussed the propriety of an attorney contacting an employee of a corporate defendant. Rule 4.2 of the West Virginia Rules of Professional Conduct states that "[i]n representing a client, a lawyer shall not communicate about the subject of representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." *Id.* at syl. pt. 1.

4. *See generally,* Phoebe Carter, J.D., Annotation, *Disciplinary Action Against Judge For Engaging In Ex Parte Communication With Attorney, Party, or Witness,* 82 A.L.R.4th 567 (1990). The author notes that "[i]n only one case, where the court found that the nature of the communication did not involve a pending matter, did the court refuse to discipline a judge on these grounds." *Id.* at 572.

only from the perspective of the *Dairyland* plaintiff, Mary Baker, and others who were not privy to it. Because CAMC was the party to whom the phone call was made, the respondent argues that CAMC has no right to complain about its *ex parte* nature. We disagree.

An *ex parte* communication is one in which only one party is engaged.[5] It is immaterial that the conversation might be beneficial to the complaining party. The very act of talking to one party without the presence of the other creates an *ex parte* situation. Without question, that is what occurred in this instance.

Evidence in the record indicates that the respondent wished to present two other judges to testify, as experts, that it is a common practice for judges to telephone parties to proceedings in their courtrooms, primarily in the interest of "speeding things along." Regardless of how well-intentioned the judges may be, these "routine" types of *ex parte* communications can expose the court system in general, and the individual judge in particular, to precisely the types of charges which Canon 3 is designed to prevent. Judges must refrain from taking actions which increase the potential for harm to both their own reputations and careers and the court system in general.

When an attorney charges a judge with displaying a predisposition against his client, and the judge then makes counter-charges against the client, all the parties are tainted. By their very one-sided nature, *ex parte* communications raise questions about motivations and impartiality which can never be resolved to everyone's satisfaction. Certainly, that is in evidence in this case, where each side has accused the other of harboring ulterior motives. Although judicial economy is a worthwhile goal, the cost is too great when the integrity of the judicial process is called into question. Quite simply, the end does not justify the means.

For the foregoing reasons, the sanctions recommended in the West Virginia Judicial Hearing Board's findings of October 22, 1991, shall be imposed upon the respondent.

Admonishment.

NEELY and WORKMAN, JJ., dissent and reserve the right to file dissenting opinions.

NEELY, Justice, dissenting:

I am shocked by the unsporting conduct of the Charleston Area Medical Center. CAMC is not an ordinary lay-person, baffled by the glacial pace of justice or perplexed by the seemingly impossible disaster of losing a just cause. CAMC is a professional player whose own lawyer performed negligently and incompetently, if not in willful contempt of Judge Kaufman's court.

Judge Kaufman did not respond in an unsporting way by imposing a sanction (such as dismissal of CAMC's case) conceivably forcing CAMC into the expense of an appeal. Judge Kaufman simply called the client to suggest that one of its own bevy of retained lawyers—perhaps a *competent* advocate who regularly arose sufficiently early to attend court—appear on the case at the next hearing. Furthermore, all the evidence from the complainants showed that the conversation between the judge and CAMC's CEO, Philip Goodwin, was entirely amiable, notwithstanding that it perhaps wandered a bit afield.

Mr. Goodwin believed that Judge Kaufman was trying to influence CAMC's position in the case before him. See maj. op. at 4. I do not condone *ex parte* communication by judges, and I certainly do not condone attempts by judges to influence cases before them. But in this case the conversation was brought on by the negligence of CAMC's own counsel. *Ex turpi causa non oritur actio.*

The senior partner of CAMC's law firm who advised Mr. Goodwin to file an ethics complaint over a nit-picking trifle was decidedly misguided. Law should be a profession practiced among gentlemen.[1] And this is a dispute that should have been

---

5. *"Ex parte"* is defined as "on one side only; by or for one party; done for, in behalf of, or on the application of, one party only." *Black's Law Dictionary* 517 (5th ed. 1979).

1. *See The Committee on Legal Ethics of the West Virginia State Bar v. Thomas L. Craig, Jr., A Member of the West Virginia State Bar,* 187 W.Va. 14, 415 S.E.2d 255 (1992) (Brotherton, J., dissenting).

settled in a gentlemanly manner, without unnecessary resort to the disciplinary process, particularly in a small community where the same lawyers must work with one another and the same judges on a daily basis. As I learned in my days in the Legislature: what goes around comes around!

I am authorized to state that Justice WORKMAN joins me in this dissent.