422 S.E.2d 478

The COMMITTEE ON LEGAL ETHICS
OF the WEST VIRGINIA STATE
BAR, Complainant,

v.

John L. BOETTNER, Jr., an Active
Member of the West Virginia
State Bar, Respondent.

No. 19211.

Supreme Court of Appeals of
West Virginia.

Submitted Nov. 6, 1991.

Decided March 24, 1992.

Dissenting Opinion of Justice
Brotherton July 21, 1992.

Certiorari Denied Oct. 5, 1992.

See 113 S.Ct. 209.

Maria Marino Potter, The West Virginia State Bar, Charleston, for complainant.

James T. Cooper, Lovett, Cooper & Glass, Charleston, for respondent.

MILLER, Justice:

This disciplinary case involves a conviction of the respondent attorney by guilty plea in the federal district court for willfully evading the payment of federal income

taxes under 26 U.S.C. § 7201.[1] This violation occurred when two individuals made interest payments totaling approximately $4,000 due on a bank loan obtained by the respondent.

■ In our earlier opinion, *Committee on Legal Ethics v. Boettner*, 183 W.Va. 136, 394 S.E.2d 735 (1990), we remanded this case for a mitigation hearing in accordance with Syllabus Point 2, in part:

> "Where annulment of an attorney's license is sought based on a felony conviction under Article VI, Section 23 of the Constitution, By–Laws, and Rules and Regulations of the West Virginia State Bar, due process requires the attorney be given the right to request an evidentiary hearing[.]"

We gave several explanations for adopting this rule.

■ We recognized that under Article VI, Section 23 of the Constitution, By–Laws, and Rules and Regulations of the West Virginia State Bar (Bar By–Laws), the annulment of any attorney's license was mandatory on proof of a conviction of a crime involving moral turpitude.[2] In prior cases we had determined that the willful failure to pay income taxes under 26 U.S.C. § 7201 was a crime involving moral turpitude. *See, e.g., In re West*, 155 W.Va. 648, 186 S.E.2d 776 (1972); *In the Matter of Mann*, 151 W.Va. 644, 154 S.E.2d 860 (1967).[3] Consequently, upon conviction of such an offense, an attorney's license would be automatically annulled. In note 5 of *Committee on Legal Ethics v. Six*, 181 W.Va. 52, 54, 380 S.E.2d 219, 221 (1989), we recognized that "annulment" is equivalent to "disbarment":

> "[I]t is clear under Article VI, Section 35 of the Bar By–Laws that disbarment of an attorney and annulment of his license are two ways of expressing the same form of punishment. 'The annulment of a license to practice law ... shall constitute a disbarment.' Annulment relates to the license and disbarment refers to the individual."

We also recognized in *Boettner*, however, that the American Bar Association's Model Rules of Professional Conduct, which had become effective in this state on January 1, 1989, had abolished the term "moral turpitude"; instead, Rule 8.4 defines "professional misconduct" as "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer[.]" The commentary to the Model Rules states:

> "The Model Rules also eliminate the troublesome 'moral turpitude' standard of DR 1–102(A)(3) of the Model Code [of Professional Responsibility]....
>
> Commentators have criticized the Model Code's reference to 'moral turpitude' as inviting subjective judgments of diverse lifestyles instead of focusing on the lawyer's ability and fitness to practice law." *Annotated Model Rules of Professional Conduct* 353–54 (American Bar Association 1984).

In view of this, we concluded in *Boettner* that there was a certain harshness about the automatic disbarment standard in tax evasion cases:

> "We find merit in Rule 8.4's abandonment of the term 'moral turpitude' and the rule's focus on the criminal act as it reflects on the attorney's fitness to practice law. Moreover, we believe that there is a certain rigidity to the approach

---

1. 26 U.S.C. § 7201 states:
   "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution."

2. The relevant language of Article VI, Section 23 of the Bar By–Laws provides: "The license of

any attorney shall be annulled and such attorney shall be disbarred upon proof that he has been convicted—(a) of any crime involving moral turpitude or professional unfitness[.]"

3. Syllabus Point 1 of *In the Matter of Mann, supra*, states: "A conviction of a charge of willfully attempting to evade and defeat income taxes in violation of the provision of Section 7201, Internal Revenue Code, (26 U.S.C., Section 7201), is a conviction involving moral turpitude."

taken in our tax evasion cases. By categorizing all tax evasion convictions as involving 'moral turpitude,' annulment of the license becomes automatic under Article VI, Section 23 of the Bar By–Laws." 183 W.Va. at 139, 394 S.E.2d at 738. This is particularly true when we look to other jurisdictions where tax evasion cases involving attorneys are dealt with by a suspension for a period of time rather than a total disbarment.[4]

Another factor leading to the creation of a mitigation hearing in *Boettner* was a due process consideration. This arose by virtue of the fact that under Article VI, Section 25 of the Bar By–Laws, "a certified copy of the order or conviction shall be conclusive evidence of guilt of the crime or crimes of which the attorney has been convicted."[5] Under this procedure, the attorney had no right to any evidentiary hearing in regard to those charges which would lead to disbarment. We stated in *Boettner:* "There is general agreement that a license to practice law is a valuable right, such that its withdrawal must be accompanied by appropriate due process procedures." 183 W.Va. at 139, 394 S.E.2d at 738. (Citations omitted).

■ Although we created the right to apply for a mitigation hearing where annulment was sought, we surrounded it with several safeguards, as illustrated by Syllabus Point 3 of *Boettner:*

"The right to an evidentiary mitigation hearing is not automatic. In order to obtain such a hearing, the attorney must make a request therefor after the Committee on Legal Ethics files its petition with this Court under Article VI, Section 25 of the Constitution, By–Laws, and Rules and Regulations of the West Virginia State Bar."

Moreover, in Syllabus Point 2, in part, we identified the focus of the mitigation hearing: "The purpose of such a hearing is not to attack the conviction collaterally, but to introduce mitigating factors which may bear on the disciplinary punishment to be imposed."

■ Subsequently, in *Committee on Legal Ethics v. Folio,* 184 W.Va. 503, 401 S.E.2d 248 (1990), we explained in Syllabus Point 3 some additional factors that should be considered in determining whether a mitigation hearing should be granted:

"The cases in which a mitigation hearing will be appropriate are the exception rather than the rule. Whether a mitigation hearing is appropriate in a particular instance will depend upon a variety of factors, including but not limited to, the nature of the attorney's misconduct, surrounding facts and circumstances, previous ethical violations, the wilfulness of the conduct, and the adequacy of the attorney's previous opportunity to present evidence sufficient for a determination of appropriate sanctions."

The factors considered in *Folio* are similar to those listed by the American Bar Association in its "Standards for Imposing Lawyer Sanctions" as being relevant mitigating circumstances to justify a reduction in the degree of discipline to be imposed. These factors are: (a) absence of a prior

---

4. *See, e.g., Supreme Court Comm. on Professional Conduct v. Jones,* 256 Ark. 1106, 509 S.W.2d 294 (1974); *Florida Bar v. Ryan,* 352 So.2d 1174 (Fla.1977); *In re Walker,* 67 Ill.2d 48, 7 Ill.Dec. 89, 364 N.E.2d 76 (1977); *Committee on Professional Ethics & Conduct v. Ulstad,* 376 N.W.2d 612 (Iowa 1985); *Louisiana State Bar Ass'n v. Ponder,* 340 So.2d 134 (La.1976), *appeal dism'd,* 431 U.S. 934, 97 S.Ct. 2643, 53 L.Ed.2d 251 (1977); *In re Barta,* 461 N.W.2d 382 (Minn. 1990); *In re Del Mauro,* 67 N.J. 400, 341 A.2d 325 (1975); *Matter of Brown,* 75 A.D.2d 398, 429 N.Y.S.2d 810 (1980); *Allen County Bar Ass'n v. King,* 48 Ohio St.3d 8, 548 N.E.2d 238 (1990); *Matter of Eisenberg,* 81 Wis.2d 175, 259 N.W.2d 745 (1977), *cert. denied,* 436 U.S. 946, 98 S.Ct.

2850, 56 L.Ed.2d 788 (1978). *See generally* Annot., 63 A.L.R.3d 512 (1975).

5. The relevant text of Article VI, Section 25 of the Bar By–Laws reads:

"In any proceeding to suspend or annul the license of any such attorney because of his conviction of any crime or crimes mentioned in sections twenty-three or twenty-four, a certified copy of the order or judgment of conviction shall be conclusive evidence of guilt of the crime or crimes of which the attorney has been convicted. A plea or verdict of guilty or a conviction after a plea of nolo contendere shall be deemed to be a conviction within the meaning of this section."

disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical or mental disability or impairment; (i) delay in disciplinary proceedings; (j) interim rehabilitation; (k) imposition of other penalties or sanctions; (*l*) remorse; and (m) remoteness of prior offenses.[6]

■ With regard to what is an appropriate disciplinary sentence for an attorney, we have traditionally recognized that it is not possible to set a uniform standard, as we acknowledged in Syllabus Point 4 of *Committee on Legal Ethics v. Roark*, 181 W.Va. 260, 382 S.E.2d 313 (1989):

> " ' "In disciplinary proceedings, this Court, rather than endeavoring to establish a uniform standard of disciplinary action, will consider the facts and circumstances [in each case], including mitigating facts and circumstances, in determining what disciplinary action, if any, is appropriate, and when the committee on legal ethics initiates proceedings before this Court, it has a duty to advise this Court of all pertinent facts with reference to the charges and the recommended disciplinary action." Syl. pt. 2, *Committee on Legal Ethics v. Mullins*, 159 W.Va. 647, 226 S.E.2d 427 (1976).' Syllabus Point 2, *Committee on Legal Ethics v. Higinbotham*, [176 W.Va. 186], 342 S.E.2d 152 (1986)."

*Roark* is also instructive on the proposition that where an attorney holds a public office his or her ethical violations are viewed more seriously, as we explained in Syllabus Point 3:

"Ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office."

■ In this case, the respondent was a member and majority leader of the State Senate and chairman of the Senate Judiciary Committee at the time of the offenses. The loan in question was obtained to pay off the respondent's back campaign expenses. At the mitigation hearing, much of the testimony was devoted to showing that the respondent was guilty of only a "technical" violation of the Internal Revenue Code. The respondent, along with an independent witness, sought to explain that the interest payments were not made at the respondent's request.

One of the payors, Mr. D'Annunzio, was a director of the bank where the loan was obtained.[7] He apparently had been active in securing the loan for the respondent. According to the record, Mr. D'Annunzio was aware of the bank's concern over the loan's delinquency. He made two payments totaling $3,619.55. The other payor made a payment in the amount of $500.

Testimony was also introduced on the respondent's behalf through a tax attorney, a Mr. Ricardi, as to the civil liability for income taxes owed as a result of the foregoing payments.[8] It was Mr. Ricardi's view that because the third-party payments were for interest owed the bank and because the interest was a deductible expense, any income to discharge it would be a "wash" for tax purposes.[9]

Other mitigating factors that can be gleaned from the record include the fact that the respondent has not received any other disciplinary punishment. He devoted some five years at the beginning of his law practice to legal services and public interest law groups. He also testified that even

---

6. "Standards for Imposing Lawyer Discipline," 50 (American Bar Ass'n, Center for Professional Responsibility 1991 ed.).

7. Mr. D'Annunzio was deceased at the time of the mitigation hearing. The record reflects that he had acted as a lobbyist.

8. The respondent's plea agreement in connection with the criminal violation allowed him to

contest his civil tax liability with the Internal Revenue Service.

9. There was also evidence introduced by the respondent that he had not been able to obtain the cooperation of the Internal Revenue Service to settle the civil tax obligation question.

in his private practice, he has devoted a considerable amount of time to public interest work. Moreover, until this event, the respondent enjoyed a good character and reputation and was regarded as a conscientious public servant.[10] Finally, we consider the offense itself. The respondent did express remorse, although this was tempered to some degree by his insistence that he was unaware of the tax consequences of the interest payments. It was apparent that the respondent was inexperienced in the federal income tax law.

■ Of some importance is the fact that the interest payments the respondent failed to report would have increased his taxable income of $25,046 by approximately $4,000, and increased his income tax liability $8,456 to $10,033. This is not a substantial amount. We believe some distinction can be made between an individual who directly receives income payments and an individual who is unaware of unsolicited payments made by others to third parties.

In considering an appropriate punishment in light of the foregoing, we recognize that the Committee's recommendation of disbarment is analogous to a five-year suspension because Article VI, Section 35 of the Bar By–Laws permits a disbarred attorney to apply for reinstatement of his license to practice after five years.[11] In *Committee on Legal Ethics v. Roark, supra,* the respondent entered a guilty plea in federal district court to six misdemeanor counts of possession of cocaine. Pursuant to the plea agreement, twenty-four other counts in the indictment were dismissed. The attorney had held the offices of prosecuting attorney and Mayor of the City of Charleston during the period when the crimes were committed. Prior to the commission of these offenses, the respondent had enjoyed an excellent reputation and good character in the community. We imposed a three-year suspension.

In *Committee on Legal Ethics v. Folio, supra,* the attorney had been convicted by a jury in the federal district court on one felony count of conspiracy to obstruct justice. We refused to grant a mitigation hearing and affirmed the annulment of the attorney's license.

More recently, in *Committee on Legal Ethics v. Craig,* 187 W.Va. 14, 415 S.E.2d 255 (1992), we imposed a three-year suspension on an attorney who had worked as an administrative assistant to the governor and illegally distributed $100,000 in campaign funds. He had also received from the governor a $5,000 cash payment, which he did not initially declare on his income tax return, and admitted lying to a federal grand jury about the distribution of campaign funds. Upon becoming aware of the governor's attempt to cover up the transaction, however, the attorney had his attorney contact the federal prosecutor's office to report that he had lied to the grand jury. He subsequently testified truthfully to the grand jury and was not criminally indicted. He also filed an amended tax return to report the $5,000 payment.

In the present case, while the funds involved are not substantial and there are some mitigating factors, as earlier noted, the crime does involve a felony. The plea bargain which accompanied the guilty plea resulted in the Government's agreement

---

10. The federal judge who handled the criminal prosecution of the respondent had this to say about the respondent at the sentencing hearing:
  "Both your career and your financial history satisfy the court that you are not an individual motivated by greed, for 6 of your 21 years of practicing law were largely sacrifice[d] to the benefit of needy clientele of the Legal Aid Society and the Appalachian Research and Defense Fund. That was followed by these last 15 years in the legislature where you pursued a political career which has simply consumed your intention and attention, and proved costly to your efforts to establish a remunerative law practice."

11. Article VI, Section 35 of the Bar By–Laws provides, in relevant part:
  "The annulment of a license to practice law by any court of competent jurisdiction shall revoke and terminate such license, and shall constitute a disbarment; provided, however, after the expiration of five (5) years from the date of such disbarment, a person, whose license to practice law has been or shall be annulled in this State and who shall desire reinstatement of such license, may file a verified petition [in this Court for reinstatement]."

not to pursue two other charges that had been investigated.[12] Under all the circumstances, we find that a three-year suspension and the payment of the costs incurred by the Committee is an appropriate sanction.

Three-year suspension and costs.

BROTHERTON, J., dissents and reserves the right to file a dissenting opinion.

McHUGH, C.J., concurs.

BROTHERTON, Justice, dissenting:

I dissent to the majority opinion for a number of reasons.

The Committee on Legal Ethics of the West Virginia State Bar recommended on two separate occasions that John L. Boettner, Jr.'s license to practice law be annulled as a result of his guilty plea to a felony in the United States District Court for the Southern District of West Virginia.[1]

In the first hearing, *The Committee on Legal Ethics of the West Virginia State Bar v. Boettner*, 183 W.Va. 136, 394 S.E.2d 735 (1990), this Court remanded the case to the State Legal Ethics Committee for a mitigation hearing. I dissented to the remand for a mitigation hearing in *Boettner, supra,* and I also dissented to the mitigation standards which were established in *The Committee on Legal Ethics of the West Virginia State Bar v. Craig,* 187 W.Va. 14, 415 S.E.2d 255 (1992).

The guidelines established in the *Boettner* remand and the mitigation standards established in the *Craig* case resulted in the Legal Ethics Committee's second recommendation that Boettner's law license be annulled. However, after a review of the recommendation and the mitigation record, a majority of this Court reduced the recommended annulment to a three-year suspension. I cite my previous dissents in *Boettner* and *Craig* as the reason for my dissent in this case.

This case appears to continue to uphold the new standard adopted by a majority of this Court, that of holding lawyers to a standard of mediocrity rather than a standard of excellence.

---

**12.** It appears that the Government had brought charges of a Hobb's Act violation under 18 U.S.C. § 1951 and conspiracy under 18 U.S.C. § 371.

**1.** As part of his plea agreement, two other charges against Boettner which had been investigated by the United States Attorney were not pursued.