**No. 27213**

**The People of the State of Colorado v. Dale G. Yoakum**

(552 P.2d 291)

Decided July 13, 1976.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edwin L. Felter, Jr., Assistant, for The People of the State of Colorado.

Dale G. Yoakum, pro se, C. J. Berardini, for respondent.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

The respondent, Dale G. Yoakum, was licensed to practice law by this court on September 17, 1963. The attorney general filed a formal complaint against the respondent, charging him in two counts with misconduct in violation of the Code of Professional Responsibility. The respondent answered this complaint. Subsequently, the attorney general filed an amended complaint containing eight counts. The respondent did not file an answer to this complaint as required by C.R.C.P. 248 and the pre-trial order. A pre-trial conference was held. The respondent appeared pro se, and the attorney general represented the People. A detailed pre-trial order was entered by the grievance committee to govern the proceedings, including the time and place of hearing.

The matter was heard by a three-member hearing panel of the grievance committee on the complaint, documentary evidence and the testimony of witnesses. Respondent appeared pro se the first two days of the five-day hearing and was represented by counsel on the remaining days.

The hearing panel, at the conclusion of the hearing, submitted a formal report of its findings of fact, conclusions and its recommendations that the respondent be disbarred and that he be assessed the costs of the proceedings. The Supreme Court Grievance Committee unanimously approved the report and referred the matter to this court for final action.

On July 6, 1976, the respondent filed a pleading entitled "Petition and Exceptions" in which he alleged he was without sufficient funds and requested this court (1) to appoint counsel to represent him, and (2) to furnish a free transcript to enable him to comply with C.R.C.P. 252 B(2). The attorney general filed a motion to strike the pleading on the grounds that the respondent had theretofore, on June 1, 1976, filed a Motion for Enlargement of Time to File Exceptions because "of the prodigious amount of testimony, evidence and research to be considered by the respondent, at least 30 days will be required to submit the proper exceptions and responses to the court."

Respondent was given to and including June 21, 1976, within which to file exceptions. The respondent did not file either exceptions or a

request for further enlargement of the time within which to file his exceptions on or before June 21, 1976, and therefore failed to comply with the applicable rules of the court. Consequently, the court, on July 8, 1976, entered an order striking respondent's "Petition and Exceptions," and a copy thereof was mailed to him that date by the clerk of this court.

One count of the amended complaint was dismissed for lack of sufficient proof. The remaining seven counts are generally referred to in the report as "the Republic Bank matter," "the Gage matter," and "the Atomic Clean matter," and they will be so referred to herein.

■ Disbarment is the ultimate disciplinary sanction that this court can impose for violations of the Code of Professional Responsibility. We, therefore, deem it appropriate to set out the findings and conclusions of the grievance committee hearing panel substantially verbatim:

"The Republic Bank Matter

"On February 23, 1972, Respondent borrowed the sum of $15,000 from Republic National Bank of Englewood. At that time he signed an installment promissory note in favor of the bank in the face amount of $16,984.50, which included a finance charge of $1,984.50 (People's Exhibit A-2).

"Some time before the disbursement of the loan and execution of the promissory note Respondent, or someone acting on his behalf, delivered to the bank Respondent's financial statement dated January 30, 1972, bearing the signature of Respondent (People's Exhibit A-1). That financial statement recites the existence of assets of $543,270 and liabilities of $55,000. Robert H. Currier, the president of the bank, testified that the bank relied on Respondent's financial statement in making the loan to him.

"Respondent testified that the loan was not obtained for his personal use, but for a client, one Doyle May, who did business as Century Motors. Respondent further testified that upon receipt of the borrowed funds he immediately turned them over to May and that, as between the two of them, May would make the note payments.

"On March 14, 1972, Respondent incorporated May's business as Colorado Century Motors, Inc., with the Colorado Secretary of State (People's Exhibit B-3). Respondent was a member of the initial board of directors of the corporation and expected to be a 10% shareholder, but the stock was apparently never issued.

"Colorado Century Motors, Inc., was in the retail automobile sales business and handled its floor plan financing through the bank. Respondent executed an ''Individual Guaranty'' of the indebtedness of Colorado Century Motors, Inc., to the extent of $15,000 in favor of Republic National Bank of Englewood by instrument dated October 26, 1972, but which was apparently not delivered by Respondent to the bank until some time in early 1973 (People's Exhibit B-1).

"Mr. Currier, the bank president, testified that the bank relied on Respondent's guaranty agreement in extending floor plan financing to Colorado Century Motors, Inc.

"In early 1973 both the loan to Respondent and the floor plan loan to Colorado Century Motors, Inc. went into default and on May 18, 1973, the bank filed a complaint against Respondent in the Arapahoe County District Court (People's Exhibit C-1) seeking recovery of the unpaid balance due on the promissory note and payment on the guaranty agreement.

"By his answer filed June 6, 1973, (People's Exhibit C-2) Respondent stated that he did not have sufficient information to determine the truth or accuracy of the bank's allegations and denied them.

"The case came on for trial before the Honorable William B. Naugle on November 5, 1973, at which time defendant confessed judgment in favor of the bank for principal, interest and attorneys' fees on the promissory note and guaranty agreement in the total sum of $25,117.28.

"No voluntary payments were ever made by defendant on said judgment, although the bank was able to collect a substantial amount through execution and from other sources. There remains an unpaid balance due on the judgment against defendant in the approximate sum of $8,184 plus an undetermined amount of interest.

"Defendant's answer in said lawsuit, as well as his deposition testimony given on June 20, 1973 (People's Exhibit E-1) and his testimony given under Rule 69 of the Colorado Rules of Civil Procedure on February 28, 1974 (People's Exhibit E-2) and March 27, 1974, (People's Exhibit E-4) demonstrate a lack of candor with respect to his obligations to the bank and with respect to his financial condition. Respondent's lack of candor was further demonstrated at the hearing in this grievance proceeding by his professed inability to identify his own signature on the promissory note and financial statement, as well as other documents admitted into evidence.

"Although Respondent attempted to place responsibility for his January 30, 1972, financial statement (People's Exhibit A-1) on his client, Doyle May, and his secretary, Sara Little, the committee finds that Respondent, personally or through an agent, delivered to Republic National Bank of Englewood said financial statement with his signature with the intent that the bank rely on said financial statement in extending credit to him, and that the financial statement was false and fraudulent in the following material respects:

"(a) Respondent did not in fact own real property located at 11780 Glennon Drive. Said property had in fact been conveyed to Respondent's wife by deed dated April 4, 1965, recorded in the records of Jefferson County, Colorado, on May 24, 1965, (People's Exhibit G).

"(b) Respondent had no judgment involving "Graham Associates". Respondent testified that Graham Associates was a corporate client of his in

which he held a minority stock interest and that Graham Associates was a plaintiff in a lawsuit which had been tried prior to January 30, 1972, and in which no judgment has ever been entered.

"(c) Respondent's income is capitalized on the financial statement in an annualized amount of $54,000, whereas Respondent's Colorado state individual income tax return for calendar year 1971 (People's Exhibit F-4) shows Respondent's Colorado adjusted gross income to be $10,191 and the total of his and his wife's Colorado adjusted gross income to be $22,156.

''The Gage Matter

"In early spring of 1971, the Respondent agreed to represent Don and Rosella Gage as their attorney incident to the transfer of a business alternately referred to as 'Turk's Supper Club' and 'DeMarco's Supper Club.'

"The Respondent was referred to the Gages, who were the purchasers, by one of the real estate brokers involved in the transaction. The reference was precipitated by Rosella Gage's insistence that she wanted a lawyer to look over the papers and make certain that the closing was properly handled.

"The evidence is undisputed that the Respondent prepared the document purporting to transfer all of the sellers' 'right, title, interest and stock in DeMarco's Supper Club, Inc.' Additionally, the Respondent attended the closing of the transaction on behalf of the Gages and participated in the delivery of the stock certificates representing ownership of the corporation being sold. These certificates were invalid under C.R.S. 1963, 31-4-8 (C.R.S. 1973, 7-4-108) in that the certificates had not been signed when originally issued and were not signed at the time of closing, or at any time, other than for purported transfer endorsements.

"In addition to failing to note the invalidity of the stock certificates, Respondent raised no question about the assignment of the business lease which, on its face, was assignable only with the written consent of the lessor. No such consent was obtained or exhibited at closing, or at any time.

"The Respondent made no meaningful inquiries, which were obviously necessary, in order to define what kind of problems might exist with reference to the assets and debts of the business being purchased. The transfer document itself which the Respondent prepared gave the Gages no protection with reference to these matters and, in fact, only indemnifies the *sellers* from any liability under the lease which was purportedly being assigned.

"The Respondent's clients were relatively uneducated, naive and unsophisticated. The transaction was not properly closed and the inadequacies with respect to the preparation for the closing were patently obvious.

"The Respondent's representation of his clients was completely incompetent, and his conduct and failures to act constituted gross negligence. As a result, the Gages suffered substantial financial loss, both incident to the closing and following the purported but ineffective transfer of the

business.

"These losses were the subject of a civil action commenced in the District Court in and for the County of Arapahoe, State of Colorado (Civil Action No. 29836). The Respondent was one of the named defendants and as a result of the trial to the Court, judgment was entered in favor of the Gages and against the Respondent in the amount of $1,625.62, that sum being a part of the Gages' total loss of $8,078.02. The Respondent took no appeal and the judgment against him, in addition to being final, remains unpaid.

"The Atomic Clean Matter

"On July 8, 1970, Respondent and one R. D. Wilson ('Wilson') entered into a Distributor Agreement and License with the American Colloid Company, whereunder Respondent and Wilson purportedly became the exclusive worldwide distributors of a cleaning product known as 'Atomic Clean +.' Although the agreement recited that $25,000 was paid for the distributorship on the date of the agreement and an additional $100,000 was to be paid within forty-five days therafter; none of said money was ever paid, and Respondent was well aware of that fact. Based on the evidence presented, it appears that neither Respondent nor Wilson ever had any legal rights to the distributorship of the Atomic Clean + cleaning product.

"On July 11, 1970, Respondent and Wilson entered into an agreement whereunder they would 'share equally in all profits derived from the sale of the product . . . .'

"On October 8, 1970, Respondent filed Articles of Incorporation with the Colorado Secretary of State for a corporation to be known as Atomic Clean Plus Ltd. ('Atomic Clean'). Respondent was an incorporator, and a member of the initial Board of Directors, of Atomic Clean. Although the alleged purpose of the corporation was to serve as distributor for the Atmoic Clean + cleaning product, there was no evidence that Atomic Clean ever had, or acquired, any legal rights to distributorship of the Atomic Clean + cleaning product, and Respondent was well aware of that fact.

"By its articles, Atomic Clean was authorized to issue up to five million shares of stock, at '$.01 (1¢) par value' per share. There was no evidence that any formal meeting of directors or shareholders of the corporation was ever held, either for the purpose of issuing stock or otherwise, or that any election of directors or officers ever took place.

"During the period from November 2 to November 9, 1970, 322,000 shares of stock in Atomic Clean were purportedly issued to three persons, including 146,000 to Wilson and 146,000 shares to Respondent. No money was paid into the corporation as capital by Respondent, and he knew that neither of the other two original shareholders had contributed any money to the corporation as capital. Respondent claimed that he received his stock as compensation for legal services rendered to Atomic Clean and as reimbursement for money allegedly expended by him on its behalf for costs and expenses. (It should be noted that said stock was not

at any time treated as income by Respondent for income tax purposes.)

"From the time Atomic Clean was formed, until at least late April of 1971, the business of Atomic Clean was conducted from Respondent's law offices in the 'penthouse suite' of a building located close to downtown Denver. Wilson, who was not part of Respondent's law office operation, used a portion of Respondent's office suite as his base of operations for his Atomic Clean activities. With minor exception, Atomic Clean paid no rent for that portion of Respondent's office space used by it, Respondent's office telephone number was also the telephone number for Atomic Clean.

"Respondent was the sole authorized signature on the Atomic Clean checking account at the United Bank of Denver, and the sole authorized signature on an account at the First National Bank of Denver known as 'Panica, Ltd.', into which some Atomic Clean funds were apparently deposited. Respondent signed Atomic Clean correspondence on its letterhead, signed transfer documents for corporate stock on behalf of Atomic Clean, and signed a banking resolution as secretary of Atomic Clean, although he was never its secretary.

"Wilson carried on his part of the Atomic Clean transactions entirely in cash. Respondent frequently, at Wilson's request, signed and delivered to Wilson, blank checks on both of the checking accounts. Checks were signed by Respondent in blank without regard to the amount or payee to be filled in, without regard to whether there would be sufficient funds in the account to cover the checks, and with no knowledge of the purpose for which the checks were to be used. At Respondent's direction, his secretary, who had worked for him five or six years, at various times signed corporate documents of Atomic Clean as president or as secretary, although she was never elected to either office.

"Shortly after Atomic Clean was incorporated, a number of persons were contacted and given the 'opportunity' to invest in Atomic Clean stock. In all, or nearly all, instances, the persons who bought stock were totally unsophisticated and unknowledgeable investors including, for example: a vacuum cleaner distributor who invested $5000; a secretary and a coal miner who, as husband and wife, invested $1000; the widow of a recently deceased military officer, who invested $1500; and another recently widowed woman who invested the entire $7500 in life insurance proceeds she had received on account of the death of her husband. Although Respondent did not act as Atomic Clean's initial contact with any of the persons who bought stock, he actively participated in the promotional activities of Atomic Clean which were directed toward the investors and participated in the other affairs of Atomic Clean; the representations made by Respondent were a substantial factor in inducing additional investment of $5000 by one investor. No application was ever made to the State of Colorado or to the Securities and Exchange Commission relating to public sale of the stock of Atomic Clean, nor did Respondent ever seek or obtain authority

to engage in public sale of securities.

"Within a short time after 146,000 shares of Atomic Clean had been issued to Respondent at $0.01 per share, the unsophisticated investors who purchased Atomic Clean stock bought their shares at $1.00 per share. During the intervening period, nothing had occurred to increase the value of Atomic Clean stock and, in fact, the stock was worthless; Respondent and the other original shareholders had contributed no capital to the corporation (except for the preparation of articles of incorporation and some other corporate documents, which were necessary to their promotional scheme), and the only 'asset' of the corporation, namely the purported exclusive distributorship of the Atomic Clean + cleaning product, was without any legal validity whatsoever. Although Respondent was well aware of these facts, he failed to disclose them to the investors and, in fact, represented to the investors that the stock had a value of $1.00 per share, and that Atomic Clean was, in fact, the exclusive world-wide distributor of the Atomic Clean + cleaning product. At the grievance hearing, Respondent testified that whether he issued himself 146,000 shares, or five million shares, prior to the time the other investors bought stock at $1.00 per share, was 'totally immaterial', and that he had no duty to explain to the new shareholders the dilution in their equity which was caused by the initial issuance of large numbers of shares to him and to Wilson for little or no consideration.

"At a later meeting of shareholders, when Respondent was asked about the distressed status of the corporation, he falsely represented to the shareholders that he, himself, had contributed $25,000 to the capital of the corporation.

"As indicated above, Respondent, on frequent occasions during his involvement in the Atomic Clean stock promotion, knowingly made false representations of material facts, and concealed material facts, from the investors, who were ignorant of those material facts; Respondent's representations were made with the intention that they be acted upon by the investors, and the investors did, in fact, act upon such representations, to their substantial damage and detriment.

"The financial transactions of Atomic Clean were handled with total disregard of the rights of the subsequent investors. At least two checks, for $2500.00 each, which had been contributed to corporate capital by one investor, were endorsed by Respondent and exchanged for cash, without ever being deposited to Atomic Clean's account. In fact, with the possible exception of all or a portion of one $2500.00 check, it does not appear that any of the capital contributed by any investor was ever deposited to the corporate account. It must be concluded, from the entire nature of the operation, that the sole purpose of Atomic Clean, in which Respondent actively participated, was to take money from innocent and unsuspecting investors, and put it in the pockets of Respondent and the other principal

of the corporation, and that this purpose was, in fact, carried out.

"In 1974, a grand jury in Pueblo, Colorado, investigated the affairs of Atomic Clean. Respondent, and his conduct, were among the subjects of that investigation. One of the defrauded investors was subpoenaed to testify before the grand jury. Before he was called to testify, Respondent offered the investor a $5000 bribe to 'go easy on' Respondent in his grand jury testimony; the bribe was refused. Respondent did not deny this bribery attempt.

"In the Atomic Clean matter, as in the Republic Bank matter, Respondent wilfully, deliberately and repeatedly gave false testimony to the Hearing Committee on a number of substantial points; these points included testimony as to the nature and extent of his involvement in the affairs of Atomic Clean, and the authenticity of his signature on various documents. Further, it should be observed that of the three persons called by Respondent to testify on his behalf, not one was a credible witness.

## "CONCLUSIONS

"Respondent's actions in the Republic Bank matter violated the highest standards of honesty, justice and morality. Respondent's false financial statement to the Republic National Bank of Englewood constituted fraud as defined in the leading Colorado case of *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937) and . . . was given knowingly and for the purpose of influencing the bank to extend credit to him, . . . .

"In the Gage matter, Respondent did not represent his clients competently, and his conduct specifically violated the requirements of Disciplinary Rule ('DR') 6-101 and, standing alone, would warrant severe discipline. *People vs. VanNocker*, 176 Colo. 354, 490 P.2d 697 (1971).

"In the Atomic Clean matter, Respondent's actions violated the highest standards of honesty, justice and morality. Respondent's active participation in the Atomic Clean stock promotion scheme constituted fraud as defined in *Morrison vs. Goodspeed, supra*, and, as such, was a violation of DR 1-102(A)(3), (4), and (6). Respondent's attempted bribery of a witness in grand jury proceedings relating to the Atomic Clean stock promotion was a violation of DR 1-102(3), (4), (5), and (6), and DR 7-109(A) and (C). Respondent's false testimony at his grievance hearing was a violation of DR 1-102(3), (4), (5), and (6). As such, this conduct is deserving of serious and substantial discipline. See, e.g.: *People vs. Klein*, 179 Colo. 408, 500 P.2d 1181 (1972) (falsification of evidence warrants indefinite suspension); and *People vs. Humbert*, 51 Colo. 60, 117 Pac. 139 (1911) (moral turpitude in business transaction warrants disbarment)."

We approve and adopt the report of the grievance committee as set forth above. It is manifest from the report of the hearing panel that the respondent has been guilty of conduct contrary to the highest standards of honesty, justice and morality and that he lacks that high degree of integrity which is absolutely essential to one who is permitted to hold

himself out as an attorney licensed to practice law by this court.

It is therefore the order of this court that the respondent, Dale G. Yoakum, be and he hereby is forthwith disbarred as an attorney, and that his name be stricken from the roll of attorneys licensed to practice law in Colorado. He is further ordered to surrender his license forthwith.

Costs incurred in these proceedings in the amount of $649.42 shall be paid to the clerk of this court by the respondent within 90 days from the date opinion is announced.