439 S.E.2d 629

The COMMITTEE ON LEGAL ETHICS
OF the WEST VIRGINIA STATE
BAR, Complainant,

v.

Mark HOBBS, a Member of the West
Virginia State Bar, Respondent.

No. 21858.

Supreme Court of Appeals of
West Virginia.

Submitted Nov. 2, 1993.

Decided Dec. 9, 1993.

Sherri D. Goodman, Bar Counsel, West Virginia State Bar, Charleston, for complainant.

Robert C. Chambers, Guy R. Bucci L.C., Charleston, for respondent.

## PER CURIAM:

In this disciplinary proceeding, the Committee on Legal Ethics of the West Virginia State Bar (Committee) found that Mark Hobbs violated the *Code of Professional Responsibility* when because of coercion from the circuit judge assigned to his medical malpractice case, he paid a percentage of his fee to the judge's wife and failed to inform anyone of the extortion for almost six years. After a hearing primarily focusing on mitigating factors, the Committee recommended that Mr. Hobbs' license to practice law be suspended for two years and that he be required to pay $1,642.73, the costs of the proceedings. Although Mr. Hobbs acknowledges that his conduct violated the *Code of Professional Responsibility*, he alleges that the Committee's disciplinary recommendations should not be accepted because the Committee failed to give proper consideration to the climate of fear and corruption that led him to succumb to the judge's pressure and to his voluntary disclosure of the extortion. Based on our independent review of the record, we find that the Committee properly considered the mitigating factors and therefore we adopt their recommended sanctions.

I

With the exception of an eighteen-month association with a small firm immediately after graduation, Mr. Hobbs has practiced alone in Chapmanville, West Virginia since his 1982 graduation from the West Virginia University College of Law. In 1988, Mr. Hobbs was an unsuccessful candidate for prosecuting attorney for Logan County; in 1990, while maintaining his private practice, he became a public defender. In 1992 Mr. Hobbs ran unopposed for prosecuting attorney and took office in January 1993.

Mr. Hobbs' unethical conduct began in May 1986, when Judge J. Neb Grubb, one of the two circuit judges in Logan County, approached Mr. Hobbs about his recently filed medical malpractice case.[1] Mr. Hobbs was representing Roy Dingess in a wrongful death action, against his wife's obstetrician, her anesthesiologist and Logan General Hospital after she died after giving birth to twins. The Dingess case was assigned to Judge Grubb. Approximately one week after the suit was filed, Judge Grubb requested that Mr. Hobbs, who was meeting in the judge's chambers on another matter, remain.[2] When the two were alone, Judge Grubb asked Mr. Hobbs, "Why don't you turn your two hundred and fifty thousand dollar case into a million?" After Mr. Hobbs said "Yeah," the judge informed him that his wife Linda Grubb, who worked as a nurse anesthetist at Logan General Hospital, knew what happened on the morning that Mrs. Dingess died. The judge told Mr. Hobbs, "Talk to Linda. She knows what happened there." Mr. Hobbs testified that he understood the exchange to mean that the judge wanted a share of his case with payment to be made to the judge's wife.

Following that meeting, Mr. Hobbs refrained from informing the local prosecutor's and the sheriff's offices of the judge's proposition because they ran on the same slate as the judge. In his testimony before the Committee, Mr. Hobbs acknowledged that other

---

1. For a disciplinary action involving Judge Grubb, *see Committee on Legal Ethics v. Grubb,* 187 W.Va. 608, 420 S.E.2d 744 (1992).

2. Our recitation of facts is based solely on Mr. Hobbs' testimony either from his deposition with Bar Counsel or his testimony before the Committee.

options were available to him, for example approaching federal prosecutors, the state police, another lawyer, his co-counsel in the malpractice case or one of his former law professors. Mr. Hobbs, however, stated that in 1986, as a sole practitioner, he remained silent because he did not see any options beyond Judge Grubb's influence.

According to Mr. Hobbs, on June 6 or 7, 1986, Mrs. Grubb visited him and told him the name of the nurse on duty when Mrs. Dingess died. Mrs. Grubb said that Mrs. Dingess' anesthesiologist had a "cavalier attitude" toward his patients. Mr. Hobbs maintained that he was already aware of the duty nurse's name and believed that the anesthesiologist's attitude would have been disclosed in discovery. After Mrs. Grubb learned that Mr. Hobbs would be paid a percentage of Mr. Dingess' recovery, she demanded four percent of his fee. Mr. Hobbs admitted that although he expected no help from Mrs. Grubb, he agreed to the fee arrangement because he feared the loss of his "one big case" and feared Judge Grubb might retaliate against him or his client.

While the medical malpractice case was pending, in other matters Judge Grubb jailed Mr. Hobbs for contempt because he was late for a hearing and fined him $100 for late discovery. According to Mr. Hobbs, he was the only lawyer disciplined by the judge. Mr. Hobbs felt the judge used the discipline to keep him cooperative and quiet.

While the malpractice case was still pending, Mr. Hobbs asked the judge if the four percent fee was acceptable. The judge replied affirmatively. After Mr. Dingess retained additional counsel in the malpractice action, Judge Grubb asked Mr. Hobbs if his wife's payment would be affected.[3] Subse-

quently, Judge Grubb was recused from the malpractice case, but only after Logan General Hospital listed Mrs. Grubb as a potential witness. After the Dingess medical malpractice case was settled before trial for $500,000, Mrs. Grubb asked Mr. Hobbs for $4,000.00 in cash or 4 percent of what she believed to be Mr. Hobbs' fee. (Actually, Mr. Hobbs' fee was $88,000.) On January 29, 1988, Mrs. Grubb went to Mr. Hobbs' office where he paid her $4,000 in cash.

Mr. Hobbs remained silent until after Judge Grubb was indicted by a United States Grand Jury on February 27, 1992. After Judge Grubb's indictment, Mr. Hobbs sought counsel and thereafter contacted the U.S. Attorney's office. Once his lawyer had arranged for immunity, Mr. Hobbs told the federal officials about Judge and Mrs. Grubb's actions in the Dingess case. Based on Mr. Hobbs' information, a superseding indictment was obtained charging Judge and Mrs. Grubb with extortion. In May 1992, although Judge Grubb was found guilty on other matters, he and Mrs. Grubb were acquitted on the extortion charge.[4]

About a week after the verdict, on May 14, 1992, Mr. Hobbs voluntarily informed the West Virginia State Bar Counsel about his contacts with Judge and Mrs. Grubb.

The Committee charged that in his contacts with Judge Grubb and his wife, Mr. Hobbs violated the following disciplinary rules of the *Code of Professional Responsibility:* (1) DR 1–102(A)(4) by engaging in dishonest and deceitful conduct; (2) DR 1–102(A)(5) by engaging in conduct prejudicial to the administration of justice; (3) DR 7–110(A) by giving something of value to a judge; and, (4) DR 7–110(B) by communicating with a judge on the merits of a case.[5]

---

3. Nothing in the record indicates that the additional counsel in the Dingess case was aware of Mr. Hobbs' arrangement with Mrs. Grubb.

4. According to Mr. Hobbs, Mrs. Grubb testified during her trial that Mr. Hobbs paid her $3,300 for her medical consultation (or 4 percent of Mr. Hobbs' actual fee), which she spent without telling her husband. Mrs. Grubb acknowledged that $3,300 was not included in her federal income tax return.

5. The *Code of Professional Responsibility* was in effect during the 1986–1988 period when the acts occurred. On January 1, 1989, the *Code of Professional Responsibility* was superseded by the *Rules of Professional Conduct.* The following are the disciplinary rules that Mr. Hobbs violated:
   DR 1–102(A)(4) and (5) state:
   Misconduct.—(A) A lawyer shall not:
   (4) Engage in conduct involving dishonesty, fraud or deceit or misrepresentation.
   (5) Engage in conduct that is prejudicial to the administration of justice.

Because Mr. Hobbs admitted his unethical conduct, the Committee's February 5, 1993 hearing focused on the mitigating circumstances including Judge Grubb's actions and Mr. Hobbs' voluntary admission of the incident. The Committee heard testimony from Marty Allen, a State Police Sergeant who spent six years investigating Judge Grubb. According to Sergeant Allen, Judge Grubb possessed substantial political power in Logan County and people feared he might fabricate criminal charges or even attempt to have them killed. Paul Billups, an Assistant U.S. Attorney, considered Mr. Hobbs' fear of Judge Grubb reasonable and stated that in 1986 although Mr. Hobbs probably could not have received help in Logan County, he could have contacted the U.S. Attorney's Office or other resources outside Logan County. Alvis R. Porter, the Circuit Clerk of Logan County, asserted that Judge Grubb occasionally asked him illegally to fire or hire certain people. Because he did not always cooperate, Mr. Porter believed that Judge Grubb sought to impeach him. Leonard Codispoti, a Magistrate for Logan County, testified that when he reported Judge Grubb's attempts to coerce him into unethical conduct to the State Police, Judge Grubb filed "baseless ethics complaints." [6] Roger Perry, a Circuit Court Judge of Logan County, testified that when he practiced before Judge Grubb he believed that politics played a role in some of Judge Grubb's judicial decisions and that Judge Grubb had unpredictable mood swings.

Mr. Hobbs testified that he voluntarily came forward after Judge Grubb's indictment because he felt that although Judge Grubb "was still a threat ... that maybe they finally have him. Maybe I don't have this to worry about, what he could do, because he's not going to have a chance." Mr. Hobbs explained that his campaign for prosecuting attorney was "on a law and order platform that some of the things, a lot of the things in Logan needed to be changed." Mr. Hobbs said, "How could I, how could I, with this sitting in my closet—I mean, how's it going to affect me, you know, not necessarily with the public but me, the individual?" Mr. Hobbs maintains disclosure by Judge Grubb was unlikely because under the scheme "he was using his wife as a scapegoat." However, when questioned whether he feared Judge Grubb would "just open up and you would be caught in the net," Mr. Hobbs admitted the possibility of disclosure by Judge Grubb concerned him.[7]

Based on the hearing, the Committee concluded that by acceding to the judge's demands, Mr. Hobbs expected either to gain and maintain an advantage with the judge in the malpractice case or that payment was

DR 7–110(A) and (B) state:

(A) A lawyer shall not give or lend anything of value to a judge, official or employee of a tribunal except as permitted by Section C(4) of Cannon 5 of the Code of Judicial Conduct

. . . . .

(B) In an adversary proceeding a lawyer shall not communicate or cause another to communicate as to the merits of the cause with a judge or an official before whom the proceeding is pending. . . .

6. *See In the Matter of Codispoti*, 186 W.Va. 710, 414 S.E.2d 628 (1992) (charges were dismissed because magistrate made reasonable efforts to perform his judicial duties). *But see In the Matter of Codispoti*, 190 W.Va. 369, 438 S.E.2d 549 (1993).

7. The following is Mr. Hobbs' complete answer to the question of Judge Grubb's possible disclosure:

Well, now, you know I'd be lying to you if I said that wasn't a thought. I don't think that was a—I knew Ned enough to know that he had it defensed up. In other words, he had it set up that like he didn't do nothing wrong, that Linda was a renegade operating on her own. And I didn't know that—I wasn't sure whether he would or not.

But the one thing I did know, and I had campaigned in '88, spent probably most of the money that I had saved in my whole life on trying to run for office with the campaign promise that, you know, things were going to be different, and I didn't want this.

You know, to this day, I'll never know whether anybody would have said anything about it, but I knew about it, and I knew that eventually, in my mind, I was going to have to deal with it. And maybe I picked on Ned when he was wounded and should have come forward earlier, but I think the fact he was acquitted on these charges, which lends credence I think to what I said, that it was always going to be two on one. It was going to be him and Linda versus me. Even with him charged with all this other stuff, they still— [sic]

necessary to obtain a fair hearing before the judge. The Committee also found that Mr. Hobbs knowingly promised to give a percentage of his fee to the wife of the judge presiding over his case and communicated *ex parte* with a judge on a pending case's merits. The Committee deemed the judge's later recusal to be insignificant.

In determining the sanctions, the Committee noted the following mitigating factors: (1) the youth and relative inexperience of Mr. Hobbs as a lawyer in 1986; (2) the "fear and trepidation" of those who practiced before Judge Grubb that they would be "mistreated verbally to the detriment of their clients and their professional future;" (3) Judge Grubb's coercion; and, (4) Mr. Hobbs' disclosure of the matter.

Although the Committee considered these factors they noted that Mr. Hobbs "had a responsibility to abide by the Code of Professional Responsibility" and that Mr. Hobbs "was simply unable to deal properly with all the factors thrust upon him." The Committee said:

The payment of money to a judge presiding over an attorney's case, whether characterized as extortion or bribery, strikes at the foundation of the judicial system and should not be countenanced.

The Committee also considered how important "my one big case" or "case that had some significance" was to Mr. Hobbs, a struggling young lawyer with political ambitions. The Committee found that ultimately Mr. Hobbs came forward because he was running for prosecutor and feared public disclosure of the transaction because of Judge Grubb's indictment.

After considering that Mr. Hobbs ultimately reported the matter, his relative youth and his lack of a prior disciplinary record, the Committee recommended that Mr. Hobbs' license to practice law be suspended for two years and that he be required to pay the costs of the proceedings.

Mr. Hobbs admits he indirectly paid money to the judge presiding over his case and does not challenge the Committee's conclu-

sion that his actions violation the *Code of Professional Responsibility*. Mr. Hobbs' challenge is to the recommended sanctions. Mr. Hobbs argues that the Committee did not give proper consideration to the climate of fear and intimidation that lead to his acquiescence, to his voluntary disclosure and to his lack of personal gain. Consideration of these factors, according to Mr. Hobbs, would indicate only a 90–day suspension.[8] However, the seriousness of Mr. Hobbs' ethical violations require us to adopt the recommendations of the Committee.

## II

The Committee's recommendations for sanctions are ordinarily given substantial consideration. In Syl. Pt. 3, in part, *In re Brown,* 166 W.Va. 226, 273 S.E.2d 567 (1980), this Court said:

Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Ethics Committee . . . are to be given substantial consideration.

*In accord,* Syl. Pt. 2, *Committee on Legal Ethics v. Keenan,* 189 W.Va. 37, 427 S.E.2d 471 (1993) (per curiam); Syl. Pt. 2, *Committee on Legal Ethics v. Mitchell,* 187 W.Va. 287, 418 S.E.2d 733 (1992). *See Committee on Legal Ethics v. Craig,* 187 W.Va. 14, 17, 415 S.E.2d 255, 258 (1992).

In Syl. Pt. 3, *Committee on Legal Ethics v. Blair,* 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 783 (1985), we stated:

This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.

*In accord* Syl. Pt. 10, *Committee on Legal Ethics v. Cometti,* 189 W.Va. 262, 430 S.E.2d 320 (1993); Syl. Pt. 1, *Craig, supra;* Syl. Pt. 6, *Committee on Legal Ethics v. Farber,* 185 W.Va. 522, 408 S.E.2d 274 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992).

---

8. Mr. Hobbs also suggests that in addition to the 90–day suspension he be required to speak to all

county bar associations about the need to come forward.

■ We outlined some of the major factors to be considered in determining a disciplinary penalty in Syl. Pt. 3, *Committee on Legal Ethics v. Walker,* 178 W.Va. 150, 358 S.E.2d 234 (1987):

In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

*In accord* Syl. Pt. 2, *Craig, supra;* Syl. Pt. 5, *Committee on Legal Ethics v. Roark,* 181 W.Va. 260, 382 S.E.2d 313 (1989).

■ This Court, as stated in Syl. Pt. 2, *Committee on Legal Ethics v. Mullins,* 159 W.Va. 647, 226 S.E.2d 427 (1976), *overruled on another matter,* Syl. Pt. 11, *Cometti, supra,* endeavors to make an individualized assessment of the sanction rather than follow a schedule of punishment.

"In disciplinary proceedings, this Court, rather than endeavoring to establish a uniform standard of disciplinary action, will consider the facts and circumstances [in each case], including mitigating facts and circumstances, in determining what disciplinary action, if any, is appropriate, and when the committee on legal ethics initiates proceedings before this Court, it has a duty to advise this Court of all pertinent facts with reference to the charges and the recommended disciplinary action." Syl. pt. 2, *Committee on Legal Ethics v. Mullins,* 159 W.Va. 647, 226 S.E.2d 427 (1976).

*In accord* Syl. Pt. 4, *Roark, supra;* Syl. Pt. 2, *Committee on Legal Ethics v. Higinbotham,* 176 W.Va. 186, 342 S.E.2d 152 (1986).

■ In this case, the ethics violations are serious. Secret payments of money to a presiding judge are a direct attack on one of the most vital areas of our legal system. To paraphrase *In re Barron,* 155 W.Va. 98, 102, 181 S.E.2d 273, 275 (1971) (disbarment for bribing a juror), we find it difficult to consider an offense which is more destructive or corruptive of the legal system of West Virginia than secret payments, however categorized, to a presiding judge. Protection of the public against members of the Bar who are unworthy of the trust and confidence essential to the attorney/client relationship is a primary purpose of professional discipline.

Although we have not previously considered a case involving bribery of or extortion by a judge, we have ordered disbarment in cases involving bribery of a juror[9]; election fraud[10]; conviction of a crime that reflects adversely on fitness to practice law[11]; conversion of funds[12]; and, obtaining money under false pretenses.[13]

Other states have found that secret payments to presiding judges are serious ethical violations justifying disbarment. In *In re Hughes,* 90 N.J. 32, 36, 446 A.2d 1208, 1210 (1982) (disbarment for bribing an I.R.S. agent), the New Jersey Supreme Court said:

Bribery of a public official and forgery of public documents are among the more serious offenses an attorney can commit. They strike at the heart of the attorney's honesty and trustworthiness as an officer of the court. Without more, these acts demonstrate unfitness to practice law.

Similarly, the Illinois Supreme Court in *In re Heller,* 126 Ill.2d 94, 108, 127 Ill.Dec. 742, 748, 533 N.E.2d 824, 830 (1988), *cert. denied,* 493 U.S. 815, 110 S.Ct. 65, 107 L.Ed.2d 32 (1989) (disbarment for arranging a series of loans for a presiding judge) commented on an eight-year period during which the lawyers continued to practice before a judge to whom they had loaned money by saying "[s]uch flagrant and continuous disregard for

---

**9.** *See Barron, supra; Brown, supra.*

**10.** *See In re Smith,* 158 W.Va. 13, 206 S.E.2d 920 (1974).

**11.** *See Committee on Legal Ethics v. Gorrell,* 185 W.Va. 419, 407 S.E.2d 923 (1991) (mail fraud): *Committee on Legal Ethics v. Folio,* 184 W.Va.

503, 401 S.E.2d 248 (1990) (obstruction of justice).

**12.** *See Committee on Legal Ethics v. Lambert,* 189 W.Va. 84, 428 S.E.2d 65 (1993).

**13.** *See Committee on Legal Ethics v. Wilson,* 185 W.Va. 598, 408 S.E.2d 350 (1991).

the integrity of our legal system cannot be countenanced." In *In re Powell*, 126 Ill.2d 15, 31–32, 127 Ill.Dec. 749, 755, 533 N.E.2d 831, 837 (1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989) (disbarment for arranging for his client, the defendant, to loan money to the presiding judge), the Illinois Supreme Court noted that the presence of a pending case was an aggravating factor.

In *Matter of Kassner*, 93 A.D.2d 87, 91, 461 N.Y.S.2d 11, 14 (N.Y.A.D.1983), *appeal denied*, 59 N.Y.2d 604, 464 N.Y.S.2d 1025, 451 N.E.2d 504 (1983), the New York Supreme Court ordered disbarment for accepting a bribe to be paid to a judge's secretary and said that such "conduct demonstrates his utter lack of minimal professional character. (Citations omitted.)" In *People v. Yoakum*, 191 Colo. 269, 277, 552 P.2d 291, 297 (1976), the Colorado Supreme Court found that an attempt to bribe a grand jury witness was "deserving of serious and substantial discipline" and ordered disbarment.

In *Application of Hetland*, 275 N.W.2d 582 (Minn.1978) (disbarment for attempting to coerce and bribe client), the Minnesota Supreme Court noted that:

> The public interest is and must be the paramount consideration; and the primary duty of the court must be protection of the public. Clear violation of a lawyer's duties to his clients and to the public compels an order of disbarment. (Citation omitted.)

*Hetland id.* at 584, *quoting, In re Application for Discipline of Hanson*, 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960). In *State ex rel. Oklahoma Bar Assoc. v. Hall*, 567 P.2d 975 (Okla.1977) (disbarment of a former governor for bribery, extortion and conspiracy), the Oklahoma Supreme Court considered the gravity of the offenses and noted that "the offense is of so grave a character as to call for serious treatment, not only as a matter of discipline to the respondent, but for its restraining influence upon others." *Hall id.*, 567 P.2d at 978, *quoting, In re Stolen*, 193 Wis. 602, 214 N.W. 379, 55 A.L.R. 1355 (1927).

In spite of the serious nature of his ethical violations Mr. Hobbs urges us to impose only a 90–day suspension of his license, public service and payment of costs.[14] In support of his position, Mr. Hobbs cites *In re Topper*, 135 Ill.2d 331, 142 Ill.Dec. 792, 553 N.E.2d 306 (1990) (suspending for one year the license of a lawyer who loaned money to the judge who was presiding over lawyer's biggest case). However unlike this case, in *Topper* the respondent requested the judge's recusal and neither the respondent nor his client benefited from the transaction.[15] The cases in which this Court has imposed a relatively brief suspension have been for matters, such as a conflict of interest[16]; altering a date on a judicial order[17]; neglect or failure to return a file[18]; failure to communicate[19]; and, making false accusations and misrepresentations.[20] The matters that resulted in a brief suspension are serious ethical violations; however, the gravity of these matters does not compare to the gravity of Mr. Hobbs' ethical violations. We re-

---

14. *See Committee on Legal Ethics v. Mitchell*, 187 W.Va. 287, 418 S.E.2d 733 (1992) (under appropriate circumstances community service can serve as a legitimate sanction).

15. *Topper* is one of several Illinois cases dealing with a judge who requested loans from attorneys who practiced before him. *See Heller, supra* (disbarment for arranging a series of loans for a presiding judge); *Powell, supra* (disbarment for arranging for his client to loan money to the presiding judge); *In re Jones*, 125 Ill.2d 371, 126 Ill.Dec. 554, 532 N.E.2d 239 (1988) (no sanction for a lawyer who did not appear before the judge to whom he loaned money); *In re Weinstein*, 131 Ill.2d 261, 137 Ill.Dec. 72, 545 N.E.2d 725 (1989) (censure for a lawyer who had one *pro bono* case, which was settled, before a judge for whom he arranged loans); *In re Karzov*, 126 Ill.2d 33, 127

Ill.Dec. 774, 533 N.E.2d 856 (1988), *cert. denied*, 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 698 (1989) (18–month suspension for a lawyer who loaned money to a judge who appointed him to a case).

16. *See Committee on Legal Ethics v. Veneri*, 186 W.Va. 210, 411 S.E.2d 865 (1991) (90 days).

17. *See Committee on Legal Ethics v. Thompson*, 177 W.Va. 752, 356 S.E.2d 623 (1987) (90 days).

18. *See Mitchell, supra* (60 days).

19. *See Committee on Legal Ethics v. Charonis*, 184 W.Va. 268, 400 S.E.2d 276 (1990) (60 days).

20. *See Farber, supra* (90 days).

ject Mr. Hobbs' suggestion of relatively minor sanctions because such sanctions would not serve as an adequate deterrent to other members of the Bar or serve to restore public confidence in the ethical standard of the profession. *See* Syl. Pt. 5, *Roark, supra.*

We agree with the Committee that this case has substantial mitigating factors. First, we note that Mr. Hobbs' payment to the judge's wife was instigated by the judge as a protection payment; however, this protection was purchased at the expense of the integrity of the legal system. Mr. Hobbs argues that he gained nothing from the protection payment. However, Mr. Hobbs did expect the judge to grant him a continuance in the malpractice case and did expect to continue with his case to receive his fee. Although the federal officials are correct in considering Mr. Hobbs a victim of extortion, this does not excuse his acquiescence because as a officer of the court, Mr. Hobbs had a responsibility not to succumb to the solicitation and to report the demand.

The second mitigating factor is that Mr. Hobbs voluntarily disclosed the judge's extortion and cooperated with federal prosecutors. Mr. Hobbs testified that he recognized the possibility that under pressure Judge Grubb might disclose the scheme, but considered it unlikely. However, before his disclosure Mr. Hobbs remained silent for six years—silent during his law and order campaign for prosecuting attorney, silent when he represented other clients before the judge, silent as the malpractice case proceeded toward trial—a silence Mr. Hobbs maintained until the judge was indicted and immunity was granted. Mr. Hobbs' evidence of the climate of fear and intimidation that Judge Grubb created in Logan County argues that he was foreclosed from reporting the judge's demand to local authorities. However, even if local resources were foreclosed, Mr. Hobbs could have notified authorities outside Logan County, such as the U.S. Attorney's Office, Bar Counsel, his co-counsel in the medical malpractice case, other lawyers, or one of his former law professors. Although we recognize that Mr. Hobbs' disclosure is a mitigating factor, the disclosure's circumstances lessen its weight.

The Committee also considered Mr. Hobbs' inexperience and lack of prior disciplinary record. Mr. Hobbs maintains that because he is currently serving as Logan County's prosecuting attorney, a suspension of more that 90 days would be unfair to the people of Logan County. Mr. Hobbs's public position, acquired after his ethical violations, is neither an aggravating factor (*see* Syl. Pt. 3, in part, *Roark, supra* ("[e]thical violations by a lawyer holding a public office are viewed as more egregious....)") nor a mitigating factor (*see Committee on Legal Ethics v. Goode,* No. 20226 (W.Va., Filed July 24, 1991) (prosecuting attorney suspended for three months for failure to file federal tax returns timely)).

The Committee's recommendations are similar to our holdings in several cases. Recently, in *Craig, supra,* we considered a case involving a lawyer who worked as an administrative assistant to the governor and illegally distributed $100,000 in campaign funds. The lawyer, who had received a $5,000 cash payment that was not initially declared on his tax return, lied to a federal grand jury about the distribution of campaign funds. We found the Committee's recommended two-year suspension insufficient because the Committee had only considered the most serious of the violations. *Craig, id.* 187 W.Va. at 18, 415 S.E.2d at 259. After we considered the charges on which the Committee did not impose sanctions, we determined that the violations were serious enough to warrant a 4–year suspension. *Craig, id.* 187 W.Va. at 19, 415 S.E.2d at 260. However, because the mitigating circumstances justified some leniency, we ordered a three-year suspension. *Craig, id.* 187 W.Va. at 19, 415 S.E.2d at 260.

In *Committee on Legal Ethics v. Boettner,* 188 W.Va. 1, 422 S.E.2d 478 (1992), we considered a case involving a member and majority leader of the State Senate, who failed to report on his federal tax return a loan he received to pay off back campaign expenses. In *Boettner,* we noted that because of a plea bargain, two charges were not pursued in exchange for Mr. Boettner's plea of guilty to a felony. *See Boettner, id.* 188 W.Va. at 7, n. 12, 422 S.E.2d at 484, n. 12, for a description of the charges that were not pursued. After

considering the presence of some mitigating factors, we ordered a three-year suspension and payment of costs.

In *Roark, supra,* another case involving a plea bargain by a public official (the Mayor of the City of Charleston and a former prosecuting attorney for Kanwaha County), we considered the serious nature of the charges as well as the added element of a public trust violation. *Roark, id.* 181 W.Va. at 265, 382 S.E.2d at 318. After considering Mr. Roark's former excellent reputation and his acknowledgement of the gravity of his offenses, we accepted the Committee's recommendation of a three-year suspension, plus payment of costs. *Roark, id. See also Committee on Legal Ethics v. White,* 189 W.Va. 135, 428 S.E.2d 556 (1993) (per curiam) (a prosecutor's possession of cocaine, marijuana and percocet warranted a 2-year suspension).

We believe that the serious nature of Mr. Hobbs's misconduct warrants disbarment. However, we find that the mitigating circumstances in this case justify some leniency. Accordingly, we adopt the Committee's recommendations and order Mr. Hobbs suspended from the practice of law for a period of two years and require him to pay $1,642.73, the costs of the proceedings. At the conclusion of the two-year period, Mr. Hobbs may petition for reinstatement to the Bar in accordance with the provisions of Article VI, Sections 31 and 32 of the By–Laws of the West Virginia State Bar.

Two-year suspension and costs.

NEELY, Justice, dissenting:

The majority's decision suspending Mark Hobbs' license to practice law for two years prolongs the victimization of Mark Hobbs, who already has been ensnared by Judge Grubb's scheme. The majority seeks to protect the public and restore public confidence in the Bar. Sadly, the severity of the sanctions imposed on this victim of extortion only undermines its goal. The majority rails at an assault on the integrity of the judicial system; its outrage, although justified, is misplaced. Instead of directing its indignation at the perpetrator-designer of the money-payment scheme, it attacks the young, inexperienced lawyer caught in the web of Judge Grubb's intrigue. Blinded by its wrath, the majority discounts the enormous power held by any circuit judge—a power magnified by Judge Grubb's political base in a relatively small community and by his personal attributes. Paul Billups, an Assistant U.S. Attorney, testified that if Mr. Hobbs had exposed the judge, "he and Judge Grubb would have been in opposite corners of the room from that day forward."

The majority's outrage also colors their view of the depth of courage required for Mr. Hobbs' disclosure even after Judge Grubb's indictment. The majority fails to consider that when Mr. Hobbs disclosed the scheme there was almost no possibility of a disclosure by the judge that would have some way damaged Mr. Hobbs. Paul Billups testified that "[i]t is possible, but not probable" that the U.S. Attorney's Office might have learned about the extortion scheme. Judge Grubb pled not guilty, publicly proclaimed his innocence and continued actively to campaign for reelection. Even the scheme's design insulated the judge because the actively involved party was the judge's wife, not the judge. At her trial, Mrs. Grubb was acquitted. Even if Mr. Hobbs had gone to the Bar with his story, Judge Grubb would have weaseled out with a story about a county judge just trying to help a young lawyer save his big case and the lawyer's misunderstanding of the poor dumb judge's friendly help.

Judge Grubb reminds me of the horses I used to ride when I was young. Now, after years of experience, I make sure I ride only hunting, cavalry (if you can still find one) or police horses because they are never mistreated. A mistreated horse, if given the opportunity, will kill its rider. Yet as I learned when I was a boy, even a mistreated horse is not so dumb as not to know how to minimize human retribution. So a treacherous horse waits for the right opportunity to get even—a paper on the road, an unfamiliar bridge, a noisy truck—something the rider isn't quite sure wouldn't cause a dumb horse to shy. Then the horse strikes. But an experienced rider usually knows when a horse is actually startled and when a horse has acted on nefarious intentions. Old Judge

Grubb was just like a horse; he struck at an inexperienced rider when he could insulate himself from blame through a plausible explanation. The majority sees the incident but refuses to recognize the wickedness of the horse and continues to blame the inexperienced rider.

In its outrage, the majority blurs the distinction between extortion (this case) and bribery. I agree that the sanction for bribery should almost always be disbarment, but that same sanction should not be applied to the *victim* of extortion.

Finally the ultimate victim of the majority's harsh treatment is the public because the majority's lack of understanding will discourage others from coming forward. The majority's two-year suspension of Mr. Hobbs deprives the people of Logan County of a prosecuting attorney with the courage to challenge an entrenched power, hobbles Mr. Hobbs' career and discourages others from finding courage at the end of the day.

Although Mr. Hobbs should not have acquiesced in Judge Grubb's scheme, I find the penalty too harsh in light of the circumstances and would impose only a ninety-day suspension, enough to teach an inexperienced rider a lesson but not to hobble him permanently.

WORKMAN, Chief Justice, dissenting:

In good conscience, I am unable to join in the majority opinion, because I believe Mr. Hobbs should be disbarred,[1] not merely have his license suspended for two years.

I reach this conclusion in full recognition of the reign of fear and intimidation conducted by Judge Grubb in Logan County at the time Mark Hobbs bribed the judge. It is not difficult to believe that, had Mark Hobbs reported the judge to the authorities or even quietly refused to pay the bribe, the judge would have taken vengeance on the lawyer in some manner. Mr. Hobbs' income and law practice probably would have suffered. But

nowhere in the Code of Professional Responsibility (the code of ethics for lawyers) does it say that lawyers shall observe the basic and universal ethical tenets of the law profession *only if it is easy or convenient.*[2]

The majority's focus on Mr. Hobbs' "youth" (in his early 30's at the time he paid the bribe) and his inexperience (admitted to the practice of law for approximately six years at the time of the bribe) are apologia which have no place in this type of case. Most seventh-grade civics students can say with certainty that paying a judge a bribe is wrong, wrong, wrong. It takes no fine-honed depth of integrity or professional experience to know how this act strikes at the very heart of the system a lawyer is sworn to uphold. What Mr. Hobbs is saying when all the superfluous language is expurgated, is that, had he failed to pay the bribe, his law practice would have suffered, he would not have been as successful. There are many ethical rules one can bend in the name of professional success, but the fact that doing the right thing can be difficult makes it no less incumbent on a lawyer to comport his conduct to the Code.

What further compounds the nature of Mr. Hobbs' wrongdoing is that, subsequent to paying off the judge, this lawyer twice presented himself to the people of Logan County seeking to serve as their chief law enforcement officer by running for prosecuting attorney in 1988 and 1992. Can we surmise that, if he is threatened by a criminal while he is prosecutor, he will demonstrate the same lack of courage and integrity if he fears repercussion?

It is ironic now to read the dissent in *Committee on Legal Ethics v. Boettner,* 183 W.Va. 136, 141, 394 S.E.2d 735, 740 (1990) written by one member of the current majority. In that case, where we first established the right of a lawyer to request a mitigation hearing before the Committee on Legal Eth-

---

1. Article VI, § 35 of the By-Laws of the West Virginia State Bar provides that an attorney who has been disbarred may, after the expiration of five years from the date of the disbarment, petition this Court for reinstatement.

2. Throughout this case, Mr. Hobbs attempts to focus the discussion on Judge Grubb. Judge Grubb has been disbarred and is in a federal penitentiary. The focus here must be on lawyer Mark Hobbs.

ics,[3] the Court eventually suspended Mr. Boettner for three years. His ethical violation grew out of a guilty plea in federal court for tax evasion as a result of failing to report constructive income of approximately $4,000 (payments which were made for him by a lobbyist on a mortgage loan). *Id.* at 137, 394 S.E.2d at 736.

The writer of that dissent literally railed about the majority's decision to permit mitigation hearings in some circumstances and, later, in the opinion suspending Mr. Boettner's license for three years, he reiterated his dissent:

> After reading the majority opinion, I wonder if the legal profession will ever climb in the eyes of the general public to a position other than that just ahead of a used car salesman. It seems that for every step forward, we take two steps back. In these days of increased awareness of ethics, both professional and personal, one would expect this Court to tighten the ethical standards applicable to members of the legal profession. Instead, the majority loosens the standards to allow erring attorneys to explain away their misdeeds. Who better than lawyers can master that hurdle?

*Id.* at 141, 394 S.E.2d at 740.

In *In re Brown*, 157 W.Va. 1, 197 S.E.2d 814 (1973), this Court annulled the law license of Bonn Brown after he was convicted in federal court of bribing a juror. Subsequently, in *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980), this Court even declined to reinstate Mr. Brown, saying: "We are not aware of any case where an attorney convicted of bribing a juror has been reinstated." *Id.* at 237, 273 S.E.2d at 573. This Court also stated that the nature of the crimes (here Brown was convicted of bribing a jury as well as conspiracy to bribe public officials), "directed as they were to the core of the legal system and the integrity of governmental institutions demonstrates a profound lack of moral character on the part of the applicant." *Id.* at 239, 273 S.E.2d at 574.

In that majority opinion, Justice Miller said it all most eloquently, and his words bear repeating:

> Woven throughout our disciplinary cases involving attorneys is the thought that they occupy a special position because they are actively involved in administering the legal system whose ultimate goal is the evenhanded administration of justice. Integrity and honor are critical components of a lawyer's character as are a sense of duty and fairness. Because the legal system embraces the whole of society, the public has a vital expectation that it will be properly administered. From this expectancy arises the concept of preserving public confidence in the administration of justice by disciplining those lawyers who fail to conform to professional standards.

*Id.* at 232, 273 S.E.2d at 570 (footnote omitted).

Although each disciplinary case must be judged on its own merits, there must be some thread of reason and consistency in how ethical sanctions are meted out. This case stands as an aberration on the landscape of law relating to legal ethics in West Virginia. Let us hope that young lawyers, whose faces are so full of energy and vision on the day they raise their hands and take their solemn professional oaths, know that these words must have meaning:

> 'I do solemnly swear or affirm that: I will support the Constitution of the United States and the Constitution of the State of West Virginia; that I will honestly demean myself in the practice of law; and, to the best of my ability, execute my office of attorney-at-law; so help me God.'

*See* Rule 7.0(c) of the Rules for Admission to the Practice of Law.

Let us hope this Court will never again fail so abysmally to breathe life into the meaning of those words.

---

**3.** The Court specified that no such hearing was automatic.